WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

United States ex rel. Daniel Hamilton,

Plaintiff,

v.

Yavapai Community College District, et al.,

Defendants.

No. CV-12-08193-PCT-PGR

**ORDER**

Relator, plaintiff Daniel Hamilton, filed this *qui tam* action alleging claims under the False Claims Act ("FCA"), along with other constitutional and state law claims. The Court previously dismissed certain claims in Hamilton's First Amended Complaint without prejudice and with leave to amend. (Doc. 74.) Hamilton subsequently filed a Second Amended Complaint (Doc. 77) and then a Third Amended Complaint (Doc. 82), which is the operative complaint at issue here. Defendants seek dismissal of the Third Amended Complaint (*see* Doc. 94 (Motion to Dismiss Defendant Guidance Academy, LLC and Motion to Dismiss John L. Stonecipher and Amanda Stonecipher (Alsobrook)); Doc. 108 (Yavapai Community College District's Motion for Judgment on the

Pleadings); and Doc. 118 (Morgan Defendants' Joinder to Yavapai Community College Districts' Motion for Judgment on the Pleadings and Guidance Defendants' Motion to Dismiss)). The Court will grant in part and deny in part the motions to dismiss.[1] The Court also will grant the motions to exceed page limits currently pending before the Court (Docs. 113, 115, 124).

**Background**

The Third Amended Complain ("TAC") alleges that in Fall 2009, YC and GA entered into a Memorandum of Understanding ("MOU") under which GA was to develop and offer as a joint venture with YC an Associate of Applied Science ("AAS") degree for Professional Pilot-Helicopter ("PPH"). (Doc. 82 at 7.) YC and GC operated under this MOU until June 24, 2013, when they began to operate under a new contract. (*Id.*)

Under the MOU, YC administered the PPH program and provided all general education, business, and ground training courses for the program; and GA provided the flight training portion of the program under YC's supervision. (*Id.*) Under the MOU, it was anticipated that the PPH program would provide students with a certain number of flight hours. For example, under the MOU, 204 hours of flight training were anticipated for Fall 2011, with 74 of those total flight hours designated for the course AVT 211, Commercial Helicopter Flight. (*Id.*)

---

[1] The Court finds that oral argument would not assist in resolving this matter and accordingly finds the pending motions suitable for decision without oral argument. *See* LRCiv 7.2(f); Fed. R. Civ. P. 78(b); *Partridge v. Reich*, 141 F.3d 920, 926 (9th Cir. 1998).

Under the MOU, YC was to pay GA all flight tuition and fees received for helicopter flight courses from Spring 2010 through Summer 2011, and all flight fees and half of the tuition received for helicopter flight courses from Fall 2011 forward.  (*Id.* at 8-9.)  YC received education benefits funds from the Veteran's Administration ("VA") to cover tuition and fees for qualified veterans enrolled in the PPH program for Spring 2010 through Fall 2013.  It is the receipt of those funds that underlie the FCA claims in the TAC.

The MOU also provided for the establishment of a GA scholarship program. Pursuant to the MOU, beginning in Fall 2011, GA donated $1,000 to the YC Foundation (a nonprofit group devoted to fund raising for YC) for every student who graduated from the PPH program.  These funds were in turn used to provide financial support through a scholarship to students enrolled in the PPH program.   In November 2011, GA representative Johnson emailed YC Director of Financial Aid Eckel and informed her that the GA scholarship funds were to be used only for those veteran students who had exhausted their VA education benefits.  (Doc. 82 at 51, ¶¶ 243-44.)  Further, it was the policy of an unidentified committee chaired by Hamilton to award GA scholarships only to students who were not eligible for VA education benefits to cover their tuition and fees.  (*Id.* at ¶ 244.)  Thus, the scholarships were awarded to support students who did not have other financial support, e.g., otherwise non-supported students in the PPH program. (*Id.* at ¶ 245.)    The GA scholarships were awarded beginning in Fall 2011.  (*Id.*)

YC and GA first offered the PPH program in Spring 2010, initially as a five-term, but later as a six-term program.  YC and GA recruited the first year class or "cohort" of

students for the PPH program with the anticipation that VA education funds would be obtained to support the program.

The PPH program was the first flight degree offered by YC.  However, in Spring 2012, YC began to offer another flight degree, the Airplane Operations ("PPA") Degree for fixed wing airplanes, through a joint venture with NorthAire Aviation, LLC ("NorthAire").  Under an agreement between YC and NorthAire, NorthAire provided the flight training portion of the PPA program at its own facility, which is separate from both YC's campus and GA's campus.  The PPA program and PPH program had different requirements and learning objectives, not the least of which was learning to fly an airplane in the PPA program as opposed to learning to fly a helicopter in the PPH program.  (*Id.*)

In Spring 2013, YC began to phase out the PPH and PPA programs and instead began offering only one flight degree program to incoming students, the Aviation Technology ("AVT") Degree.  Students could still concentrate in different fields through the AVT program, including Helicopter Operations ("AVT (Helicopter)") and Airplane Operations ("AVT (Airplane)"), among others.   Like the PPH program, the AVT (Helicopter) Degree program was offered by YC in conjunction with GA; and, similarly, like the PPA program, the AVT (Airplane) Degree program was offered by YC in conjunction with NorthAire.

The TAC alleges that Defendants failed to comply with a rule known as the "85/15 Rule," and submitted false certifications that they were in compliance.  The TAC alleges that the PPH program, from the time it began in Spring 2010, was never in compliance

with the 85/15 Rule, and that at least from Fall 2011 forward, Defendants knowingly included as "non-supported" in their 85/15 compliance calculations students who did not qualify as non-supported and that Defendants thereby created the false appearance of compliance with the 85/15 Rule.[2]  (*Id.* at 12, ¶¶ 79-81, 83; *id.* at 45-46, ¶¶ 193-200.)

Specifically, in June 2011, a VA representative informed YC that the PPH program was not in compliance with the 85/15 ratio for Spring 2010 and Summer 2011 terms because the PPH program had "not followed the 85 percent [veteran] enrollment limitation."  (*Id.* at ¶ 191.)  In Summer 2011, YC representatives discussed with VA representative John Crawford a procedure for petitioning for a waiver of the 85/15 Rule, and in July 2011, a YC representative met with a staff member of U.S. Senator John McCain's office to seek the assistance of Senator McCain in obtaining such a waiver for the PPH program.  In August 2011, YC applied to VA for a waiver of the 85/15 Rule, but the VA ultimately declined to issue a waiver for the PPH program.  (*Id.* at 46-47, ¶¶ 202-05.)  The TAC alleges that Defendants thereafter engaged in various fraudulent acts to falsely make it appear that YC then came into, and continued to stay in, compliance with the 85/15 Rule.  The TAC goes into great detail regarding these and other allegations against Defendants.  To the extent necessary, the Court will discuss those details below.

**Motion to Dismiss Standard**

In addressing a motion to dismiss a complaint, the Court must determine whether

---

[2] The gist of the 85/15 Rule, which will be discussed more extensively below, is that, to receive education benefit funds from VA for veteran students, not more than 85% of the enrolled students can be supported by VA or by the educational institution.  *See* 38 C.F.R. § 21.4201(a).

the factual allegations in the complaint, together with all reasonable inferences, state a "plausible" claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

The FCA imposes liability for knowingly making, using, or causing to be made or used, "a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  The heightened pleading standard for allegations of fraud under Federal Rule of Civil Procedure 9(b) governs claims brought under the FCA.  *Cafasso, U.S. ex rel. v. General Dynamics C4 Systems, Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011).  To satisfy this heightened standard, the complaint "must identify the 'who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false.'"  *Id.* at 1055.

The FCA targets falsity, not negligent misrepresentation.  *See United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996).  Thus, "[i]nnocent mistakes, mere negligent representations and differences in interpretations are not false certifications under the Act."  *Id.*; *see Hagood v. Sonoma County Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996) ("The statutory phrase 'known to be false' does not mean scientifically untrue; it means a lie.") (internal quotation marks and citation omitted).  On the other hand, the "knowing" scienter needed for a violation of the FCA may be established not

only though a showing of actual knowledge of the falsity of a claim, but also through a showing of deliberate indifference or reckless disregard of whether the claim is false. *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1017, 1050 (9th Cir. 2012). This Court must dismiss a claim brought under the FCA if it fails "to plausibly make [the] requisite allegation of 'knowing' scienter in the total circumstances alleged." *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014).

## **Discussion**

Defendants move to dismiss the TAC and this action with prejudice. They contend, even viewing the factual allegations of the TAC in the light most favorable to Hamilton, he has failed to plead his claims with sufficient specificity and/or failed to state a claim upon which relief may be granted. They also contend that dismissal should be with prejudice given the previous opportunities provided to Hamilton to amend his complaint to address deficiencies.

A.   Count I – Violation of 31 U.S.C. § 3729(a)(1)(A) – Submission of False Claim for Payment or Approval

The False Claims Act imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The TAC alleges that Defendants violated this provision of the FCA in two ways: (1) by knowingly presenting or causing to be presented false or fraudulent claims for payment that failed to comply with the 85/15 Rule, and (2) by knowingly presenting or causing to be presented false or fraudulent claims for payment that charged flight fees for flight time that was not provided.

1. *The 85/15 Rule*

The 85/15 Rule is set forth in 38 C.F.R. § 21.4201.  Under this Rule, the VA

> shall not approve an enrollment in any course for an eligible veteran, not already enrolled, for any period during which more than 85 percent of the students enrolled in the course are having all or part of their tuition, fees or other charges paid for them by the educational institution or by VA . . . .

38 C.F.R. § 21.4201(a).

The method of calculating the 85/15 ratio is set out in subsection (e) of the 85/15 Rule.  *See* 38 C.F.R. § 21.4201(e).  Relevant here is subsection (e)(2), which defines how students are to be assigned to each part of the 85/15 ratio:

> (2) Assigning students to each part of the ratio. Notwithstanding the provisions of paragraph (a) of this section, the following students will be considered to be nonsupported provided VA is not furnishing them with educational assistance under title 38, U.S.C., or under title 10, U.S.C.:
>
> > (i) Students who are not veterans or reservists, and are not in receipt of institutional aid.
>
> . . . .
>
> > (iv) Undergraduates and non-college degree students receiving any assistance provided by an institution, if the institutional policy for determining the recipients of such aid is equal with respect to veterans and nonveterans alike.

38 C.F.R. § 21.4201(e)(2)(i), (iv).

Thus, under the 85/15 Rule, students can be counted as "non-supported" if they (1) are not having "all or part of their tuition, fees or other charges paid for them by the educational institution or by VA," 38 C.F.R. § 21.4201(a); (2) "are not veterans or reservists, and are not in receipt of institutional aid," 38 C.F.R. § 21.4201(e)(2)(i); or (3) are receiving institutional aid, "if the institutional policy for determining the recipients of

such aid is equal with respect to veterans and nonveterans alike," 38 C.F.R. § 21.4201(e)(2)(iv).

The TAC alleges that Defendants violated the 85/15 Rule by counting as "non-supported" various students, including (a) students enrolled for terms from the time the program was initiated in 2010; (b) students enrolled through the GA Employee Enrollment Plan; (c) students who received financial assistance through a GA Scholarship Program; (d) students who received financial assistance through an Expanded Scholarship Program; (e) students who were enrolled through the combined AVT Degree program who were not in the Helicopter concentration portion of the program; and (f) students who were admitted through the JTED program.

### a. *Enrollment for terms up to and including Summer 2011 term*

The TAC alleges that from the beginning of the Helicopter training program in 2010, the program was in violation of the 85/15 Rule. According to the TAC, in June 2011, a VA representative informed YC that for Spring 2010 through Summer 2011 terms, the program had not complied with the 85% supported student enrollment limitation. (Doc. 82 at 45, ¶ 191(a).) Hamilton contends Defendants' efforts to seek a waiver after being informed that the PPH program was not in compliance with the 85/15 Rule "supports the inference that they knew of [VA's] interpretation and knew that they were not in compliance with the interpretation" and thus that their violation of the 85/15 Rule was, from the beginning of the program, knowing (Doc. 114 at 8). The Court disagrees. That Defendants sought and applied for a waiver can just as easily be interpreted to demonstrate merely that Defendants sought to take advantage of the waiver

provision after being informed by VA that they were not in compliance with the 85/15 Rule and that there was a method for applying for a waiver of the Rule (Doc. 82 at 45, ¶ 191, and 46, ¶¶ 202-04).  *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''") (quoting *Twombly*, 550 U.S. at 557).

The TAC does not contain factual allegations demonstrating that prior to June 2011 Defendants were aware that they were not in compliance with the 85/15 Rule, let alone that they knowingly and intentionally submitted false claims based on enrollment for the terms up to and including the Summer 2011 term.  Accordingly, the Court will grant dismissal of Count I claims relating to enrollment for the terms up to and including Summer 2011 term that are based on violation of the 85/15 Rule.

> **b.**    **GA Employee Enrollment Plan**

Hamilton contends that students who were GA employees enrolled in the PPH program through the GA Employee Enrollment Plan did not qualify as non-supported students under the 85/15 Rule, and that GA and YC knowingly and fraudulently included these students as non-supported in the 85/15 certifications in support of their claims for payment.

According to the allegations of the TAC, within a few days of VA's June 2011 notification to YC that it had not been in compliance with the 85/15 Rule, GA representatives Stonecipher and Johnson met with YC representative Morgan with a plan to bring the PPH program into compliance with the 85/15 Rule.  (Doc. 82 at 47, ¶ 208.)

Under this plan, GA would enroll GA employees in the PPH program at GA's expense, and YC would in turn include those GA employees as "non-supported" for purposes of the 85/15 Rule calculations and certifications.  Morgan expressed discomfort with GA's plan but agreed to go along with it for a few terms, until they could come up with another recruitment plan that would qualify for and sustain compliance with the 85/15 Rule.  (*Id.* at 47-48, ¶ 213; *id.* at 50, ¶ 236.)  Defendants implemented the GA Employee Enrollment Plan between July 2011 and August 2011 through GA's publishing of a policy statement that required, as a condition of GA employment or continued employment, all GA employees to either have an aviation degree or to pursue an aviation degree through YC's aviation program.  (*Id.* at 48, ¶¶ 216-17.)

The TAC alleges that students that were enrolled through the GA Employee Enrollment Plan were improperly counted as non-supported for several reasons.  First, the TAC alleges that GA's stated policy of requiring its employees to have or pursue an aviation degree was false because GA's actual policy and practice was to enroll only as many non-veteran employees as necessary to make it "appear" that YC was in compliance with the 85/15 Rule and no more.  Assuming that GA did intentionally enroll only the number of employees needed each term to make sure that the 85/15 Rule was met, Hamilton does not point to any provision of the 85/15 Rule, or any other regulation or statute, and the Court has found none, that prohibits this method of complying with the 85/15 Rule.

Second, the TAC alleges that during Spring and Summer 2012, GA threatened its veteran employees that if they were to pursue a degree in YC's <u>PPA</u> program they could

be terminated.  (*Id.* at ¶ 218.)   Assuming YC threatened veteran employees with termination if they enrolled in the PPA (Airplane) program, which was administered by NorthAire rather than GA, this is not relevant to whether GA's enrollment of employees in the PPH (Helicopter) program could be counted as non-supported enrollment under the 85/15 Rule.  Further, even if this could be deemed relevant, the TAC does not provide the identity of these veteran GA employees who were allegedly threatened, the identity of the individual at GA who allegedly made these threats, or how these alleged threats were made.  *See Cafasso*, 637 F.3d at 1055 (to satisfy the heightened pleading standard for FCA claims, the complaint "must identify the 'who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false'").

Third, the TAC alleges that GA paid the tuition for non-veteran employees that enrolled in the PPH program, but did not pay the tuition for veteran employees Jason Martin (Fall 2011) and James Schneider (Spring 2013) when they enrolled in the PPH program.  (Doc. 82 at 50, ¶ 231.)  The TAC does not, however, allege that these veteran employees, or any other veteran employees, sought to enroll in the PPH program through the GA Employee Enrollment Plan and were denied that benefit.  Thus, these facts do not demonstrate that the GA Employee Enrollment Plan discriminated against veterans.  *See* 38 C.F.R. § 21.4201(e)(2)(iv) (students receiving institutional aid are considered non-supported "if the institutional policy for determining the recipients of such aid is equal with respect to veterans and nonveterans alike").

Fourth, the TAC alleges that Defendants had different attendance requirements for the students enrolled through the GA Employee Enrollment Plan than other PPH students because "defendants did not expect regular attendance from GA employee-enrollees but did require other students to regularly attend those same courses."  (Doc. 82 at 25 ¶ 131(b).)  Assuming that a difference in attendance requirements (or other differences) impacted whether the GA employees could be counted as non-supported for purposes of the 85/15 Rule, the TAC contains no factual allegations demonstrating that Defendants knew or suspected the differences would impact the 85/15 Rule calculations and, despite such knowledge or suspicion, still included the GA employees as non-supported in the 85/15 calculations.

Although the TAC alleges that Morgan expressed discomfort with the GA Employee Enrollment Plan, this allegation does not, by itself, demonstrate that Morgan knew or acted with reckless disregard in having the GA employee students included as non-supported because such discomfort could have been expressed for numerous reasons unrelated to knowledge or suspicion regarding whether such students qualified as non-supported.  *See Iqbal*, 556 U.S. at 678; *Gonzalez*, 759 F.3d at 1115.

Finally, the TAC alleges that GA ended its Employee Enrollment Plan in Fall 2013, and no longer required its employees to pursue an aviation degree.  These facts do not, however, indicate anything more than that GA decided to end the plan and aviation degree requirement, a decision that could have been made for a variety of entirely legitimate reasons.  *See Iqbal*, 556 U.S. at 678.

The TAC fails to state a claim for violation of the FCA by submission of false claims based on students enrolled in the PPH program through the GA Employee Enrollment Plan. Accordingly, the claims in Count I related to enrollment in the GA Employee Enrollment Plan will be dismissed.

### c.   *GA Scholarship Program*

Hamilton contends that PPH students who received financial assistance through the GA Scholarship Program did not qualify as non-supported students under the 85/15 Rule, and that GA and YC knowingly and fraudulently did include these students as non-supported in the 85/15 certifications submitted in support of their claims for payment.

The TAC alleges that financial assistance through the GA Scholarship Program was awarded in Fall 2011 to unidentified non-supported PPH program students (Doc. 82 at 51, ¶ 245); in Spring 2012 to Jesse Kirkwood ($13,000) and two other non-veteran non-supported students ($1,000 each) (*id.* at ¶ 246); and in Fall 2012 to unidentified otherwise non-supported civilian students in the PPH program (*id.* at 52, ¶ 248). Neither these nor any other allegation in the TAC demonstrate that a veteran student was ineligible for an award of financial assistance through the GA Scholarship Program, that a veteran student applied for and was denied financial assistance through the GA Scholarship Program, or that veterans and nonveterans were treated differently in terms of eligibility for an award of financial assistance through the GA Scholarship Program. *See* 38 C.F.R. § 21.4201(e)(2)(iv) (providing that a student receiving institutional financial assistance can be considered non-supported "if the institutional policy for

determining the recipients for such aid is equal with respect to veterans and nonveterans alike").

The TAC alleges that it was the policy of GA and YC to award financial assistance through the GA Scholarship Program only to students who had exhausted their VA benefits or were not eligible for VA benefits to cover their tuition (Doc. 82 at 51, ¶¶ 243-45).  The TAC also alleges that the scholarship funds were awarded only to non-supported students in the PPH program, and that PPH student Jesse Kirkwood understood the purpose of the GA scholarship was to assist privately funded students to pursue courses in the aviation degree programs (*id.* at ¶¶ 245, 247).  These allegations do not, as Hamilton contends, demonstrate that the scholarship funds were awarded only to non-veterans.  To the contrary, these allegations indicate that veterans who did not have other means of support were eligible, as were other students who did not have other financial support.  In other words, the allegations can be interpreted to demonstrate that the GA Scholarship Program was a need-based financial assistance program and that the scholarships were awarded to veteran and nonveteran students who did not have other sources of support.  *See Iqbal*, 556 U.S. at 678.

In sum. there are no factual allegations in the TAC demonstrating that a veteran in need of financial assistance was not eligible for the GA Scholarship Program or that it was the policy of GA or YC to treat veterans and nonveterans differently in determining eligibility for the receipt of financial assistance through the GA Scholarship Program.  *See* 38 C.F.R. § 21.4201(e)(2)(iv).  Thus, the TAC fails to state a claim for violation of the FCA based on the inclusion as non-supported those students that received financial

assistance through the GA Scholarship Program.   Accordingly, the claims in Count I related to students receiving financial assistance through the GA Scholarship Program will be dismissed.[3]

### d.   _Expanded Scholarship Program_

Hamilton contends that the scholarship program was expanded ("Expanded Scholarship Program"); that PPH students who received financial assistance through the Expanded Scholarship Program did not qualify as non-supported students under the 85/15 Rule; and that GA and YC knowingly and fraudulently did include these students as non-supported in the 85/15 certifications.   Hamilton further contends that, even if the scholarship program was not expanded, the plan to expand the scholarship program demonstrates Defendants' willingness to deceive the VA.

According to the TAC, in Fall 2011, GA representatives Johnson and Stonecipher approached YC Foundation representatives, then later approached Hamilton and YC representative Morgan with a proposed expanded scholarship idea they claimed would "significantly impact 85/15" by making the PPH program more attractive and accessible to non-veterans.   (_Id._ at 52, ¶¶ 250-51.)   Stonecipher and Johnson explained that their idea was to increase flight fees by an additional 10-15% and apply the funds generated by that increase to fund more civilian scholarships.   This expansion of the scholarship program would allow for the full funding of civilians and would thus satisfy the 85/15

---

[3] The Court also notes that the TAC fails to include factual allegations demonstrating scienter regarding the inclusion of these students as non-supported, which provides an additional independent ground for dismissal.

requirement and allow for unlimited enrollment of VA supported veterans.  (*Id.* at ¶ 252.) They further explained that their plan would not only solve the 85/15 problem but would also cost nothing out of pocket because the money to fund the Expanded Scholarship Program would be generated through the increased flight fees.  (*Id.* at ¶ 253.)

The TAC alleges that Hamilton informed Johnson and Stonecipher that their proposed plan was neither ethical nor legal because VA would effectively be covering 100% of the costs of everyone in the program, including civilians, and that it would be obvious to VA what YC and GA were doing.  (*Id.* at 52-53, ¶¶ 254-55.)  Johnson and Stonecipher responded that VA would know about it only if YC told them.  (*Id.* at 53, ¶ 256.)  Hamilton then pointed out that even if YC did not tell VA, the veterans in the program would see YC increasing prices by 15% and also see that all of their civilian cohorts all of a sudden had 100% scholarships, and it would not take anyone very long to figure out what was happening.  (*Id.* at ¶ 257.)

The TAC alleges that on May 14, 2012, Johnson, Morgan, and others met and continued developing a plan to set aside money from increased flight fees to fund non-supported students.  During the last week of May 2012, Morgan told Hamilton that Morgan had been in a meeting between Stonecipher and YC leadership in which they had discussed the possibility of a joint scholarship between YC and GA for the same purpose as had been previously discussed by Stonecipher and Johnson.  (*Id.* at ¶¶ 258-59.) Hamilton told Morgan that such a scheme would also be illegal and would violate VA regulations.  (*Id.* at ¶ 260.)  Morgan did not respond to Hamilton.  The TAC alleges a belief that YC and GA ultimately did expand the scope of the scholarship program

consistent with this plan but alleges that even if it was not expanded, the discussions regarding expanding the scholarship program demonstrate Defendants' willingness to deceive VA. (*Id.* at ¶ 262.)

Even assuming that the Expanded Scholarship Program was implemented, the allegations of the TAC do not demonstrate that this expansion resulted in false claims being submitted to the VA.  The TAC alleges that the Expanded Scholarship Program was going to be funded through an increase in flight fees.  Hamilton has not pointed to any regulation that would prohibit increasing flight fees in general, nor has he pointed to any regulation that would prohibit GA and/or YC from using funds that were raised from the increased flight fees to fund a scholarship program.

Further, there is no factual allegation demonstrating that these increased flight fees were charged only to VA funded students rather than to all students equally.  There also is no factual allegation demonstrating that only non-veterans qualified for receipt of financial assistance through this Expanded Scholarship Program, that a veteran applied for and was denied financial assistance through this Expanded Scholarship Program, or that it was the policy of YC or GA to otherwise treat veterans and nonveterans differently in determining eligibility for the receipt of financial assistance under the Expanded Scholarship Program.  *See* 38 C.F.R. § 21.4201(e)(2)(iv).

In sum, there are no factual allegations in the TAC demonstrating that Defendants' alleged expansion of the scholarship program violated any regulation, or that the inclusion as non-supported in 85/15 certifications those students who received financial assistance through the Expanded Scholarship Program violated the 85/15 Rule.

Accordingly, the claims in Count I related to students receiving financial assistance through the Expanded Scholarship Program will be dismissed.

e.       *Single AVT Degree Program*

Hamilton contends the students from the new AVT Degree program, which combined what had been the PPH and the PPA program into a single aviation degree program, did not all qualify as non-supported students under the 85/15 Rule, and that GA and YC knowingly and fraudulently included non-qualifying students as non-supported in the 85/15 certifications.

The TAC alleges that in Summer 2011, Stonecipher and Morgan developed and proposed the idea for the unified AVT Degree in order to increase non-veteran enrollment that could be used for the 85/15 Rule calculations.  (Doc. 82 at 53, ¶ 263.)  In Fall 2011 through Spring 2012, Stonecipher and Morgan repeatedly discussed with Hamilton and others their idea of this single combined aviation degree program.  (*Id.* at ¶ 264.)  Stonecipher and other GA representatives explained to Hamilton that the AVT Degree would entice non-veterans to enroll in lower cost concentration curricula of the AVT program, and that this enrollment could be used to balance the much higher veteran enrollment in the more expensive curricula of the AVT (Helicopter) concentration of the program.  (*Id.* at 54, ¶ 266.)

The TAC alleges that on July 30, 2012, after Hamilton's termination, Morgan met with Stonecipher, along with other YC and GA representatives and discussed the combined aviation degree program as a possible way to satisfy the 85/15 Rule.  (*Id.* at ¶ 265.)  Despite YC's concerns that VA would not analyze the combined AVT Degree as

a single program, YC began to phase out the PPH program and started offering the AVT Degree program in Summer 2013.  (*Id.* at ¶ 267.)  Since then, Defendants have used the total enrollment in all AVT Degree concentrations to compute compliance with the 85/15 Rule.  (*Id.* at ¶ 268.)  All AVT Degree students have been included in the calculation of the 85/15 ratio even though the students have differing curriculum and other requirements, have different fields and objectives, have separate campus extensions or branches, and have different subcontractors providing the flight portion of the AVT Degree programs.

The requirements for when separate 85/15 ratio calculations is required is set out in 38 C.F.R. § 21.4201(e)(1).  Neither YC nor GA specifically address whether the combined AVT  (Helicopter) and AVT (Airplane) constitute separate courses requiring separate 85/15 ratio calculations under this regulation.  The Court will thus assume that the AVT (Helicopter) and AVT (Airplane) courses would be interpreted as requiring separate 85/15 calculations.

As to whether Defendants knew or acted with reckless disregard that such separate calculations were required, the TAC alleges that Morgan voiced concern at a meeting with the other Defendants that YC did not know how VA would analyze the combined degree program for 85/15 compliance.  The Court finds this allegation to be sufficient to demonstrate Defendants' suspicion that using the enrollment of the combined AVT Degree program was not allowed under the 85/15 Rule.  Given this suspicion, using the combined enrollment for purposes of determining 85/15 compliance without making further inquiry was deliberately indifferent or with reckless disregard of whether separate

calculations were required.  Accordingly, dismissal will be denied as to the claims in Count I related to students enrolled through the new AVT Degree program.

### f.   *Counting JTED Students as Non-Supported*

Hamilton contends that students enrolled through a new Joint Technology Education District ("JTED") program, a partnership between YC and a local high school, did not qualify as non-supported students under the 85/15 Rule, and that GA and YC knowingly and fraudulently included JTED students as non-supported in the 85/15 certifications.

The TAC alleges that in early Fall 2011, Morgan spoke with Hamilton about the potential of YC partnering with a local high school's JTED program as a solution to the 85/15 Rule.  (*Id.* at 55, ¶ 272.)  On July 12, 2012, Morgan stated that he was interested in getting JTED students in the aviation program to count them as non-supported for the 85/15 ratio, and that he thought YC could get 125 students from JTED, "and if we can count it [them], then game over and we won't need civilians because we will have them." (*Id.* at ¶ 274.)   However, around this same time, Sheila Jarrell, a YC Registrar, told Morgan, Johnson, Short, and Yeley (NorthAire) that "there is a statute" that prevents the JTED students from being counted as civilians.  (*Id.* at ¶ 273.)

The TAC alleges that, despite these concerns, in Fall 2013 Defendants implemented the JTED program and began to enroll JTED students as part-time college enrollees.  (*Id.* at 55, ¶ 275.)  YC waived the tuition fee for JTED students in aviation related courses, but did not waive tuition for veterans for those same courses.  (*Id.* at ¶ 276.)  JTED students enrolled in aviation courses also had different requirements than

students in the AVT (Helicopter) program, including different admission requirements and different objectives, with the JTED program not having the objective of either a degree or flight certification; and differences in course requirements, with JTED students not being required to take any helicopter training courses or general education courses. (*Id.* at 55-56, ¶278.)  In addition, the JTED program was not open to veterans.

The Court finds these allegations sufficient to withstand dismissal on the pleadings.  First, the allegations demonstrate that the JTED students would not be considered as non-supported under the 85/15 Rule because, among other things, veterans were treated differently than the JTED students in the award of financial assistance, such as tuition waiver.  *See* 38 C.F.R. § 21.4201(e)(2)(iv).  Second, the allegations demonstrate that YC representatives were aware that JTED students may not be eligible to be counted as non-supported under the 85/15 Rule.  Accordingly, these allegations are sufficient to show that YC acted with reckless disregard, if not with knowledge, that inclusion of the JTED students as non-supported in the 85/15 certification may have violated the 85/15 Rule.

   2.   *Billing for flight fees for which flight time not provided*

Hamilton contends that GC billed YC for flight hours that were not provided, that YC in turn submitted claims to VA that included those non-provided flight hours, and that GA thereby knowingly caused YC to submit false or fraudulent claims to VA for payment of flight hours that were not provided.

The TAC alleges that Stonecipher and GA failed to provide the full number of flight hours contemplated in the PPH program.  Specifically, the TAC alleges that, under

the MOU, each flight course in the PPH curriculum is to provide a certain number of flight hours and that Stonecipher and GA failed to provide the designated number of hours in two ways.   First, after a student passed the check-ride[4] and obtained the certification for a given flight course, the student was no longer provided flight hours for the course.   Thus, for example, Christopher Waite took AVT 121, a helicopter instrument flight course, in Fall 2011.   Per the MOU, AVT 121 should have provided Waite with 30 hours of flight time.   However, Waite passed his check-ride and obtained his certification at 25.2 hours of flight time.   GA did not provide Waite with the remaining 4.8 hours of flight time contemplated for the course under the MOU.   However, GA billed YC $28,200 in flight fees for Waite, which represented the flight fee charges for 30 hours of flight time rather than the 25.2 hours provided to Waite.   (Doc. 82 at 56, ¶¶ 281-85.)   YC in turn submitted a claim to VA for Waite, which included flight fees for 30 hours for Fall 2011, and VA paid all of the flight fees YC claimed for Waite.   (*Id.* at ¶¶ 286-88.) The TAC alleges that GA similarly denied flight hours, and submitted invoices to YC for denied flight hours for Fall 2011, for at least eighteen additional students named in the complaint; and for Spring 2012 for at least nine students.   (*Id.* at 57, ¶¶ 290-91.)   Despite not delivering the full flight hours to these students, and without disclosing to YC the actual number of flight hours delivered, Stonecipher had GA submit invoices to YC for the full amount of flight fees for the courses.   (*Id.* at ¶¶ 292-93.)

---

[4] The "check-ride" is the Federal Aviation Administration's certification that the student has demonstrated proficiency in the relevant skills.

Second, the TAC alleges Stonecipher and GA did not provide the full flight hours to students who had to repeat a flight course. Specifically, the TAC alleges that, occasionally, a student would take a flight course but fail the check-ride. To pass the course, that student would be required to repeat the course and practice additional flight skills until the student could pass the check-ride. If a VA-supported student had to repeat a course, VA would pay for the first repeat. (*Id.* at ¶¶ 294-96.)

The TAC alleges that by September 2011, Stonecipher and GA implemented a policy under which GA would provide students repeating the AVT 211 course only half of the AVT 211 required flight hours and only half the number of hours offered to students taking the course for the first time. However, GA charged YC the same amount for flight time for students repeating the course as those taking it for the first time. Thus, GA charged repeat students as if they were getting the full number of flight hours rather than half. (*Id.* at 57-58, ¶ 297.) GA then submitted invoices to YC for repeat students that charged the full amount of flight fees and thus billed for more hours than the repeat students were provided. YC in turn submitted claims to VA for more hours than the repeat students were provided. GA never informed YC that for students repeating the course, GA provided only half the flight hours but charged YC flight fees for the full amount of flight hours. (*Id.* at 58, ¶¶ 299-300.)

GA and Stonecipher contend the TAC does not contain factual allegations showing they submitted the billing to YC knowing that the billing was false and for the purpose of causing YC to submit a false or fraudulent claim to VA. However, the Court finds the TAC's allegations sufficient to withstand dismissal on the pleadings on this

claim.  Specifically, the TAC's allegations demonstrate GA and Stonecipher's knowledge that fewer flight hours were provided to the students than were required under the MOU; knowledge that billings were submitted to YC for the full amount of the flight hours required under the MOU; and the failure to disclose to YC that fewer flight hours were being provided than were billed to YC.  These allegations are sufficient to demonstrate that GA and Stonecipher submitted to YC invoices for flight fees for flight hours not provided with knowledge or reckless disregard that YC would rely on those invoices in submitting claims to VA.   Dismissal of claims against GA and Stonecipher related to billing for flight hours not provided will therefore be denied.

The allegations of the TAC do not, however, demonstrate that YC or Morgan knew or suspected that GA was billing YC, and that YC was in turn submitting claims to VA, for flight fees for flight hours not provided by GA.  Thus, the claims against YC and Morgan related to billing for flight hours not provided will be dismissed.

### 3.   *Conclusion as to Count I*

The Court will dismiss Count I as to all claims arising prior to Summer 2011 term related to the failure to comply with the 85/15 Rule, all claims related to the GA Employee Enrollment Plan, all claims related to the GA Scholarship Program and the Expanded Scholarship Program, and all claims against YC and Morgan related to the billing for flight hours not provided by GA.  The Court will deny dismissal of Count I as to claims related to the combined AVT Degree Program and the JTED Program, and the claims against GA and Stonecipher for billing for flight hours that were not provided.

**B.**   <u>Count II – Violation of 31 U.S.C. § 3729(a)(1)(B) – False Records or Statements</u>

The FCA imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  The TAC alleges that YC and Morgan violated this provision of the FCA by knowingly using records or statements, including certifications and statements of assurance of compliance with the 85/15 Rule and claims for payment of flight fees for flight hours not provided by GA.  The TAC alleges that GA and Stonecipher violated this provision by knowingly causing YC to use false records or statements including false certifications regarding compliance with the 85/15 Rule, knowingly causing YC to use false GA invoices for payment of flight hours that were not provided by GA, and knowingly using a false statement that GA had a policy of requiring all employees to hold an aviation degree or pursue a degree from YC as a condition of employment or continued employment.

For the reasons discussed previously in relation to Count I, the Court will dismiss Count II as to all claims arising prior to Summer 2011 term related to the failure to comply with the 85/15 Rule, all claims related to the GA Employee Enrollment Plan, all claims related to the GA Scholarship Program and the Expanded Scholarship Program, and all claims against YC and Morgan related to the billing for flight hours not provided by GA.  The Court will deny dismissal of claims related to the combined AVT Degree Program and the JTED Program, and the claims against GA and Stonecipher for billing for flight hours that were not provided.

C.    Count III – Violation of 31 U.S.C. § 3729(a)(1)(G) - Reverse False Claims

The FCA imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).

To be actionable under § 3729(a)(1)(G), the "reverse false claims" section, an obligation to pay money "must exist at the time the alleged false record or statement was made or used and must be a specific, legal obligation . . . in the nature of those that give rise to actions of debt at common law for money or things owed."  *U.S. ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 801 (8th Cir. 2011) (citation and quotation marks omitted).  A potential or contingent obligation to pay the government for overpayments, or for false claims, is not sufficient to state a claim under the reverse false claim section of the FCA. *Id.*; *see U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 653 (5th Cir. 2004) ("In a reverse false claims suit, the defendant's action does not result in improper payment by the government to the defendant, but instead results in no payment to the government when a payment is obligated.").[5]

_____

[5] Hamilton's reliance on *United States v. Bourseau*, 531 F.3d 1159 (9th Cir. 2008) is misplaced.  *Bourseau* adopts the definition set out by the Eighth and Sixth Circuits for a reverse false claim, and also cites with approval the Fifth Circuit's definition in *Bain* of "what an obligation is not."  *Id.* at 1169-70 (citing *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 735 (6th Cir. 1999); *United States v. Q Int'l Courier, Inc.*, 131 F.3d 770, 773 (8th Cir. 1997); *Bain*, 386 F.3d at 657).  The Ninth Circuit found that an "obligation" supporting a reverse false claim existed in the case before it based on the

The TAC does not allege facts demonstrating an obligation to pay the government existed at the time the false records or statements were used, or false claims submitted, but instead merely alleges a potential or contingent obligation to pay the government for false claims.   This is insufficient to state a claim for reverse false claims liability. Accordingly, Count III will be dismissed.

D.     Count IV – Violation of 31 U.S.C. § 3729(a)(1)(C) – FCA Conspiracy

The FCA imposes liability on anyone who "conspires to commit a violation" of the FCA.  31 U.S.C. § 3729(a)(1)(C).  (Doc. 82 at 61-62, ¶ 325.)  The only FCA claims remaining to support the FCA conspiracy claim are those related to the AVT Degree Program and the JTED Program.  The Court will therefore grant dismissal of Count IV for all claims except those related to the AVT Degree Program and the JTED Program.

E.     Count V – Violation of 31 U.S.C. § 3730(h) – FCA Retaliation

The FCA makes it unlawful to discharge an employee "because of lawful acts done by the employee . . . in furtherance of an action" under the FCA or for "other efforts to stop" a violation of the FCA.  31 U.S.C. § 3730(h).

To state a claim for FCA retaliation, the TAC must allege:  (1) that Hamilton "engaged in activity protected under the statute"; (2) that YC "knew the plaintiff engaged in protected activity"; and (3) that YC terminated Hamilton because he engaged in the protected activity.  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th

---

specific medicare reimbursement provisions at issue in the case.  *Bourseau*, 531 F.3d at 1170.  Those provisions are not applicable to the present case and Hamilton has pointed to no equivalent provisions that are applicable.

Cir. 2008).    The heightened pleading standard for fraud claims does not apply to Hamilton's FCA retaliation claim.  *See id.*

The TAC meets the requirements of stating a FCA retaliation claim.  The TAC alleges facts that, construed in favor of Hamilton, demonstrate that Hamilton reasonably believed that YC may have been committing fraud against the government by including as non-supported students whose tuition was paid in whole or in part by YC and/or GA and students enrolled under the Expanded Scholarship Program.  The TAC also alleges facts demonstrating that Hamilton expressed to YC and the other Defendants his opposition and opinion that the planned expansion of the scholarship program violated the law and was fraudulent.  Finally, the TAC alleges that YC terminated Hamilton's employment in retaliation for his activities of investigating and opposing Defendants' practices that he believed to be fraudulent.

The TAC sufficiently alleges a FCA retaliation claim against YC.  Accordingly, the Court will deny the motion to dismiss Count V.

F.      Count VI – Retaliation in Violation of A.R.S. § 23-1501

The TAC alleges that YC violated two anti-retaliation provisions of the Arizona Employment Protection Act.  Specifically, the TAC alleges that YC violated (1) A.R.S. § 23-1501(3)(c)(i) by terminating Hamilton for refusing to violate federal law and Arizona laws against fraud, and (2) A.R.S. § 23-1501(3)(c)(ii) by terminating Hamilton in retaliation for reporting in a reasonable manner conduct by YC that he reasonably believed to be in violation of Arizona law.  (Doc. 82 at 63, ¶ 334.)

Section 23-1501(3)(c)(i) imposes liability on an employer for terminating an employee in retaliation for "refusal by the employee to commit an act or omission that would violate the Constitution of Arizona or the statutes of" Arizona.  The TAC does not, however, allege that Hamilton was asked by YC to violate any specific provision of the Arizona Constitution or any specific Arizona statute and that he was terminated for refusing to do so.  Accordingly, the TAC does not state a claim for violation of § 23-1501(3)(c)(i).

Section 23-1501(3)(c)(ii) imposes liability on an employer for terminating an employee in retaliation for disclosing, "in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated or will violate the Constitution of Arizona or the statutes."  The TAC does not, however, allege any Arizona Constitutional provision or any specific Arizona statute that Hamilton believed and reported that YC or an employee of YC was or would violate.  Accordingly, the TAC does not state a claim for violation of § 23-1501(3)(c)(ii).

Count VI fails to state a claim and will therefore be dismissed.

G.     Count VII – Interference with Contractual Relations by GA and Stonecipher

To state a claim for intentional interference with contract against GA and Stonecipher, the TAC must allege facts demonstrating (1) the existence of a valid contractual relationship, (2) Guidance's knowledge of the relationship, (3) Guidance's intentional interference inducing or causing a breach, (4) resulting injury to Hamilton, and (5) that Guidance acted improperly.  *See Safeway Ins. Co., Inc. v. Guerrero*, 106 P.3d 1020, 1025 (Ariz. 2005).  Further, because, as discussed below, the claim as set forth in

the TAC sounds in fraud, the TAC must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b).  *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005).  The Court finds that the TAC meets this heightened pleading standard, and thus states a claim for interference with contractual relations against Stonecipher and GA.

The TAC alleges that Hamilton had a valid contractual relationship for employment with YC, and that GA and Stonecipher knew of this employment.  The TAC further alleges that GA and Stonecipher, knowing of Hamilton's employment relationship with YC, pressured YC to terminate Hamilton so that YC and GA could continue with their fraudulent schemes, cover up violations of VA regulations, and retaliate against Hamilton for opposing GA's schemes to defraud the VA and for opposing GA's failure and refusal to comply with the 85/15 Rule.  (Doc. 82 at 63, ¶¶ 336-38.)  The TAC alleges that on March 5, 2012, Stonecipher met with Hamilton and GA representatives Johnson and Short; NorthAire representative Yeley; and YC's program administrator, Renee Alanis, and that during this meeting, Stonecipher "threw the 85/15 Rule regulations down in front" of Hamilton and "threatened to jeopardize" Hamilton's job to his superiors.  (*Id.* at 63-64, ¶¶339-40.)

The TAC further alleges that on May 8, 2012, Stonecipher and GA, through their attorney, Alex Vakula, emailed YC's attorney, Franklin Hooper, disparaging Hamilton with false statements, and specifically that Vakula falsely accused Hamilton of being completely unqualified for his position; claimed that Hamilton lack the qualifications to teach ground school classes, even though Hamilton had the necessary qualifications; claimed that Hamilton had no experience whatsoever in helicopter aviation even though

Hamilton had prior helicopter flight experience; implicitly demanded that Hamilton be fired, asserting that if Hamilton was "put in a position where he is even indirectly providing advice, evaluation, inspections or supervision to GA, the entire insurance policy may become <u>void</u>"; asserted that if Hamilton were allowed to review GA's safety records, it would increase the exposure and liability burden for the college, but that GA had no problem with other college officials reviewing the same information; and accused Hamilton of having a conflict of interest and an intention to use GA's confidential information for an improper purpose.  (*Id.* at ¶ 341.)  On May 31, 2012, YC terminated Hamilton's employment by firing him.

The Court finds the TAC's allegations state, with sufficient particularity, a claim for interference with contractual relations by Stonecipher and GA.

However, Count VII does not state a claim for "blacklisting" by Stonecipher and GA in violation of A.R.S. § 23-1361.  (*Id.* at ¶ 343.)  To "blacklist" is defined as an "understanding or agreement whereby the names of any person . . . shall be spoken, written, printed or implied for the purpose of being communicated or transmitted between two or more employers of labor," and "whereby the laborer is prevented or prohibited from engaging in a useful occupation."   A.R.S. § 23-1361(A).   In other words, blacklisting is a process that occurs between two or more employers.   The alleged pressure placed by GA (a non-employer) on YC (an employer) to get rid of Hamilton (an employee) does not, without more, fall within the meaning of blacklisting.

In sum, Count VII states a claim with sufficient particularity for interference with contractual relations against Stonecipher and GA, and dismissal will be denied as to that

portion of Count VII.  Count VII does not, however, state a claim for blacklisting in violation of A.R.S. § 23-1361 against Stonecipher and GA and that portion of Count VII will therefore be dismissed.

## H.    Count VIII – Liberty Interest

"[A] liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality." *Tibbetts v. Kulongoski*, 567 F.3d 529, 535 (9th Cir. 2009) (citations and internal quotation marks omitted) (alteration in original).  "To implicate constitutional liberty interests, . . . the reasons for dismissal must be sufficiently serious to 'stigmatize' or otherwise burden the individual so that he is not able to take advantage of other employment opportunities." *Id.* (citations and internal quotation marks omitted).  If, when terminating an employee, the employer makes public a charge that impairs either the employee's reputation for honesty or morality, a liberty interest is implicated and the employee must be allowed to "refute the stigmatizing charge." *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir. 1998) (per curiam).

To state a claim for violation of a liberty interest in connection with employment termination, a plaintiff must allege facts demonstrating "1) the accuracy of the charge is contested; 2) there is some public disclosure of the charge; and 3) it is made in connection with the termination of employment or the alteration of some right or status recognized by state law." *Llamas v. Butte Community College Dist.*, 238 F.3d 1123, 1129 (9th Cir. 2001).

The TAC alleges that YC falsely reported to VA that Hamilton had falsified flight records, that YC terminated Hamilton for doing so, and that YC did not give Hamilton the opportunity to refute the charge.  (Doc. 82 at 65, ¶ 349.)  Specifically, the TAC alleges that on July 5, 2012, Morgan emailed Eckel and Aldrich falsely accusing Hamilton of lying about flight hours that VA paid for, and that on August 9, 2012, Eckel emailed Swafford of VA telling her that Hamilton "purposefully fabricated [] discrepancies" in flight hours and that YC had "since terminated" him.  (*Id.* at ¶¶ 350-51.)  The TAC alleges that these statements have seriously damaged Hamilton's standing and associations in the community, imposed a stigma on Hamilton, and negatively impacted his ability to take advantage of other employment opportunities.  (*Id.* at 65-66, ¶¶ 352-54.)

The July 5, 2012, email was made only between YC employees involved with the aviation programs.  (*See* Doc. 82, at 65, ¶ 351 (stating email sent by Morgan to Eckel and Aldrich); *id.* at 9, ¶ 64 (alleging that Aldrich is YC's VA Services representative and Eckel is YC's Director of Financial Aid); *id.* at 3, ¶ 13 (alleging that Morgan is the Dean of Career and Technical Education Campus for YC).  This email does not, therefore, constitute a public disclosure necessary to implicate a protected liberty interest.  *See Learned v. City of Bellevue*, 860 F.2d 928, 933 (9th Cir. 1988) ("Learned's supervisors did not 'publicly' stigmatize Learned; any defamatory remarks that may have been made did not go beyond others employed by the Department and would not interfere with Learned's liberty to pursue the career of his choice.").

The August 9, 2012, email from Eckel to Swafford of VA, stating that Hamilton "purposefully fabricated [] discrepancies" in flight hours and that YC had "since terminated" him does, however, constitute a public disclosure.  Further, contrary to YC's assertion, this disclosure is closely related to Hamilton's termination from YC's employment.  However, to be actionable as a violation of the Fourteenth Amendment's liberty interests, the disclosure must "effectively exclude the employee completely from [his] chosen profession."  *Blantz v. Cal. Dep't of Corrections & Rehabilitation*, 727 F.3d 917, 925 (9th Cir. 2013).

The TAC alleges that the disclosure of the charge of falsifying flight records forecloses Hamilton from seeking government employment requiring a security clearance or background check.  (Doc. 82 at 66, ¶ 354.)  Although Hamilton does "not have a liberty interest[] in a specific employer," *Llamas v. Butte Community College Dist.*, 238 F.3d 1123, 1128 (9th Cir. 2001), if, as a result of the disclosure, he would be barred from future government employment in his field of aviation, a liberty interest is implicated. *See Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 574 (1972) "[T]o be deprived not only of present government employment but of future opportunity for it is certainly no small injury.").  The Court thus finds that the TAC sufficiently states a claim for violation of a liberty interest in relation to the August 9, 2012, email from a YC representative to a VA representative.  The motion to dismiss Count VIII will therefore be denied.

I.      Count IX – YC and Morgan's Intentional Interference with Contractual Relations

1.      *Claims against YC*

YC contends that the intentional interference with contractual relations claim, as a state law claim, is barred because Hamilton filed this action prior to serving a Notice of Claim on YC, as required under Arizona Law, citing A.R.S. § 12-821.01(A).  Hamilton concedes that he filed his notice of claim after he filed the original complaint.  He contends, however, that the original complaint, which was filed under seal on September 24, 2012 (Doc. 1), was never served on YC; that YC thus never had to respond to the original complaint; and that the notice of claim was filed in November 2012, many months before the amended complaint was served on YC.  Thus, Hamilton contends, that he met the notice of claim requirement.  The Court agrees, and further notes that § 12-821.01 was amended in early 2012 such that pre-suit notice is no longer explicitly required.  *See*  A.R.S. § 12-821.01; 2012 Ariz. Legis. Serv. Ch. 110 (H.B. 2319).

YC also contends that Hamilton failed to properly serve the notice of claim because he did not serve each member of the Governing Board of YC and because his service on an unauthorized individual does not constitute valid service.  Specifically, YC contends that service of process on a school district must be, but was not, accomplished by serving the "Chief Executive Officer" which, for YC, is its Governing Board.  (Doc. 108 at 14-15; Doc. 125 at 9.)

Under Arizona Rule of Civil Procedure 4.1, service of process upon a governmental entity that is not the State, a County, or a Municipal Corporation, must be made on (a) "[t]he individual designated by the entity pursuant to statute to receive

service of process" or (2) if the entity has not designated such a person, "then the chief executive officer(s), or, alternatively, the official secretary, clerk, or recording officer of the entity as established by law." Ariz. R. Civ. P. 4.1(h)(4)(A), (B). YC does not indicate that it has designated an individual to receive service of process, and Hamilton does not argue that it has. Accordingly, service of process may be made either on the chief executive officer(s) of YC or the official secretary, clerk or recording officer of the entity.

Hamilton contends that he properly served the notice of claim on YC by serving the notice through Marilyn Yetter, executive assistant to the President of the Board of YC (Doc. 116 at 13). Hamilton contends that prior to service, his counsel's office contacted YC and that Ms. Yetter informed Hamilton's counsel's office that she was authorized to accept service of the notice on behalf of the Governing Board, and that accordingly the notice was addressed to and served upon Ms. Yetter. Hamilton has provided evidence, in the form of an affidavit, in support of his contentions. (Doc. 116-1 at 2.)

YC does not dispute that service of the notice was made on Ms. Yetter, nor does it dispute that Ms. Yetter represented to Hamilton's counsel's office that she was authorized, as the executive assistant to the president of the Governing Board, to accept service on behalf of the Governing Board. Further, the notice of claim was addressed to the Governing Board, and was served on Ms. Yetter at the office of the President of the Governing Board, expressly because Ms. Yetter represented that she was authorized to accept service on behalf of the Governing Board. The Court finds, under these circumstances, that YC was properly served with the notice of claim. *See Creasy v.*

*Coxon*, 750 P.2d 903, 905-06 (Ariz. Ct. App. 1987) (service of notice to the offices of president and vice-president of community college sufficient to effect service). Accordingly, the state law claims against YC are not barred by failure to properly serve the notice of claim.

> 2.    *Interference with Contractual Relationship with NorthAire*

The TAC, construed favorably to Hamilton, demonstrates that Hamilton was engaged in or anticipated taking training from and obtaining employment with NorthAire; that YC/Morgan knew of this relationship; that YC/Morgan intentionally interfered with  this relationship by threatening that YC would terminate their relationship with NorthAire if NorthAire had anything to do with Hamilton; that, as a result of this threat, NorthAire refused to allow Hamilton to complete that training and was not willing to hire Hamilton; and that this threat from YC/Morgan was for improper purposes.  (Doc. 82 at 66-67, ¶¶360-368.)  The Court finds these and the other allegations of the TAC sufficiently state a claim of interference with contractual relations with NorthAire.

Contrary to the assertion of YC/Morgan, the potential relationship between Hamilton and NorthAire for training and employment is sufficient at this stage to support the intentional interference claim.  *See Antwerp Diamond Exchange of America, Inc. v. Better Business Bureau of Maricopa County, Inc.*, 637 P.2d 733, 740 (Ariz. 1981) (holding that defendant's publication of defamatory reports about plaintiff's business would likely have deterred potential customers and therefore supported a claim for tortious interference); *Edwards v. Anaconda Co.*, 565 P.2d 190, 191 (Ariz. Ct. App.

1977) (holding that defendant's interference in contract negotiations between plaintiff and a third party for the purchase of plaintiff's mining claims supported a claim for tortious interference because there was a specific, identifiable relationship with which defendant had interfered, even though no contract was actually formed).

Also contrary to YC/Morgan's assertion, blacklisting would apply to a situation between YC, as a former employer, and NorthAire, as a potential future employer. *See* A.R.S. § 23-1361(A), (B) (defining blacklisting as an understanding or agreement between "two or more employers of labor" regarding an individual, and providing an exception for a former employer providing a requesting employer with information regarding the individual "for the purpose of evaluating" that individual "for employment"). However, there is no allegation in the TAC that an understanding or agreement was reached between NorthAire and YC/Morgan. Thus, Hamilton's reliance on the blacklisting statute to support his intentional interference with contract claim fails. Similarly, the TAC's reliance on A.R.S. § 13-2911 to support this claim fails as § 13-2977 is inapplicable to any of the allegations in the TAC. *See* A.R.S. § 13-2911 (criminal statute making it unlawful to, among other things, threaten to cause physical injury or damage to an educational institution, an employee, or a student of the institution, or to the property of the institution, employee, or student).

Dismissal of Count IX to the extent it alleges Interference with Contractual Relationship with NorthAire will be denied. However, Count IX will be dismissed to the extent it relies on either A.R.S. § 23-1361 or A.R.S. § 13-2911.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### 3.     _Interference by Morgan with Contractual Relationship with YC_

The TAC alleges that Morgan tortuously interfered with Hamilton's employment with YC by wrongfully terminating Hamilton with improper motive and means, including the violation of federal and state employment rights referred to in other counts of the TAC.  (Doc. 82 at 67, ¶ 369.)  Although Morgan joined in YC's motion to dismiss, YC provided no argument in support of dismissal of this portion of Count IX, and Morgan has not provided any independent argument.  Accordingly, dismissal of the portion of Count IX alleging Morgan interfered with Hamilton's contractual relationship with YC will be denied.

### 4.     _Interference with Contractual Relationship with VA_

The TAC also alleges that Morgan and YC interfered with Hamilton's economic relationship with VA by preventing Hamilton from finishing courses for which he was enrolled at YC in 2012 and by falsely passing him on two courses he did not complete.  (Doc. 82 at 67-68, ¶ 372.)  Specifically, the TAC alleges that YC and Morgan knew Hamilton's education was being paid for by the VA under a post-9/11 benefits program, and that under that program, benefits were limited to 36 months of tuition.  (_Id._ at 68, ¶ 374.)  The TAC alleges that Morgan and YC prevented Hamilton from completing four courses when Morgan forbade Hamilton from returning to the YC campus after firing him, by pressuring NorthAire to exclude Hamilton from the NorthAire campus, and by compelling Hamilton to surrender his student ID card, which gave him electronic access to buildings on campus where his classes were held.  (_Id._ at ¶ 375.)  The TAC also alleges that in Spring 2012, YC gave Hamilton a passing grade for two courses that he did not

complete, did not pass the required flight check-ride, and did not get the benefit of the associated flight training time; and that YC should not have given Hamilton a passing grade for those courses because, by doing so, YC prevented Hamilton from retaking the courses and having VA pay for the repeat of the courses, and obtaining the flight training time benefit for the courses using VA support.   The TAC does not, however, contain factual allegations demonstrating that YC and/or Morgan intended to interfere with Hamilton's VA education benefits in taking these actions.   To the contrary, the TAC allegations merely indicate YC/Morgan's intent to get and keep Hamilton off of the YC campus.   Thus, the TAC fails to state a claim for intentional interference with contractual relationship with the VA.  *See Iqbal*, 556 U.S. at 678.

J.     Claims against Stonecipher in Personal Capacity

Stonecipher contends that the TAC fails to state a claim against him in his personal capacity. (Doc. 94 at 17-18.)    The Court disagrees.   The TAC, for example, alleges that Stonecipher and Morgan developed and proposed the idea for the combined AVT Degree Program and repeatedly discussed the program with Hamilton and others; and that during a meeting that included Stonecipher, Morgan expressed concern regarding how VA would analyze the AVT Degree program for compliance with the 85/15 requirement.   (Doc. 82 at 53-54.)   The TAC also alleges that Stonecipher was involved in GA charging YC for flight fees for flight hours that were not provided by GA, and that Stonecipher implemented a policy giving repeat students only half the flight hours contemplated and that were billed to YC.   (Doc. 82 at 57-58.)   These and other allegations in the TAC are sufficient to state a claim against Stonecipher in his personal

capacity.  *Cf. Stoner v. Santa Clara County Office of Educ.*, 502 F.3d 1116, 1123-24 (9th Cir. 2007) (error to dismiss individual Defendants in personal capacity on ground complaint did not allege Defendants acted outside scope of official responsibilities because "[t]he plain language of the FCA subjects to liability 'any person' who, among other things, knowingly submits a false claim or causes such a claim to be submitted").

K.     Dismissal with Prejudice

Although leave to amend a deficient complaint should be freely provided when justice requires, *see* Fed. R. Civ. P. 15(a), leave to amend may be denied where further amendment of the complaint would be futile, *see Gordon v. City of Oakland*, 627 F.3d 1092, 1094 (9th Cir. 2010).  Hamilton has been provided with clear direction from the Court and several opportunities to amend.  Although Hamilton has corrected some deficiencies in the allegations he brings against Defendants, he has failed to correct others, and there is no indication that he would be able to correct any remaining deficiencies through further amendment.  Accordingly, the Court finds that any further amendment would be futile, and dismissal of the identified claims will be with prejudice.

**Conclusion**

The Court will grant in part and deny in part the motions to dismiss.[6]

Count I, Submission of False Claims in violation of 31 U.S.C. § 3729(a)(1)(A), and Count II, False Records or Statements in violation of 31 U.S.C. § 3729(a)(1)(B), will be dismissed as to all claims relating to enrollment for the terms up to and including

---

[6] The Court has considered the other arguments raised by the parties that are not explicitly addressed in this Order.

Summer 2011 term that are based on violation of the 85/15 Rule; all claims related to the GA Employee Enrollment Plan; all claims related to the GA Scholarship Program and the Expanded Scholarship Program; and all claims against YC and Morgan related to the billing for flight hours not provided by GA.  Dismissal of Counts I and II will be denied as to claims related to the combined AVT Degree Program and JTED Program, and claims against GA and Stonecipher related to the billing for flight hours that were not provided by GA.

Count III, Reverse False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(G), will be dismissed.

Count IV, False Claims Act Conspiracy, in violation of 31 U.S.C. § 3729(a)(1)(C), will be dismissed as to all claims except those related to the AVT Degree Program and the JTED Program.

Dismissal of Count V, False Claims Act Retaliation in violation of 31 U.S.C. § 3730(h), will be denied.

Count VI, retaliation in violation of A.R.S. § 23-1501, will be dismissed.

Count VII, Interference with Contractual Relations by GA and Stonecipher, will be dismissed only to the extent the claim seeks to rely on the blacklisting statute, A.R.S. § 23-1361.  Dismissal of Count VII will otherwise be denied.

Dismissal of Count VIII, Liberty Interest, will be denied.

Count IX, YC and Morgan's Intentional Interference with Contractual Relations, will be dismissed to the extent it seeks to bring a claim for intentional interference with contractual relationship with the VA, and to the extent it relies on either A.R.S. § 23-

1361 or A.R.S. § 13-2911. Dismissal of Count IX will otherwise be denied.

IT IS ORDERED that the Motion to Dismiss Defendant Guidance Academy, LLC and Motion to Dismiss John L. Stonecipher and Amanda Stonecipher (Alsobrook) (Doc. 94) and Yavapai Community College District's Motion for Judgment on the Pleadings (Doc. 108), in which Morgan Defendants joined (Doc. 118), are Granted in part and Denied in part as follows:

Count I, Submission of False Claims in violation of 31 U.S.C. § 3729(a)(1)(A): All claims based on violation of the 85/15 Rule related to enrollment for the terms up to and including Summer 2011; all claims related to the GA Employee Enrollment Plan; all claims related to the GA Scholarship Program and the Expanded Scholarship Program; and all claims against YC and Morgan related to the billing for flight hours not provided by GA are Dismissed with Prejudice. Dismissal of Count I is otherwise Denied.

Count II, False Records or Statements in violation of 31 U.S.C. § 3729(a)(1)(B): All claims based on violation of the 85/15 Rule related to enrollment for the terms up to and including Summer 2011; all claims related to the GA Employee Enrollment Plan; all claims related to the GA Scholarship Program and the Expanded Scholarship Program; and all claims against YC and Morgan related to the billing for flight hours not provided by GA are Dismissed with Prejudice. Dismissal of Count II is otherwise Denied.

Count III, Reverse False Claims Act, in violation of 31 U.S.C. § 3729(a)(1)(G): Dismissed with Prejudice.

Count IV, False Claims Act Conspiracy, in violation of 31 U.S.C. § 3729(a)(1)(C): All claims based on violation of the 85/15 Rule related to enrollment for the terms up to and including Summer 2011; all claims related to the GA Employee Enrollment Plan; all claims related to the GA Scholarship Program and the Expanded Scholarship Program; and all claims related to the billing for flight hours not provided by GA are Dismissed with Prejudice. Dismissal of Count IV is otherwise Denied.

Count V, False Claims Act Retaliation in violation of 31 U.S.C. § 3730(h): Dismissal is Denied.

Count VI, retaliation in violation of A.R.S. § 23-1501: Dismissed with Prejudice.

Count VII, Interference with Contractual Relations by GA and Stonecipher: Dismissed with Prejudice only to the extent the claim seeks to rely on the blacklisting statute, A.R.S. § 23-1361. Dismissal is otherwise Denied.

Count VIII, Liberty Interest: Dismissal is Denied.

Count IX, YC and Morgan's Intentional Interference with Contractual Relations: Dismissed with Prejudice as to the claim for intentional interference with contractual relationship with the VA, and to the extent the claim relies on either A.R.S. § 23-1361 or A.R.S. § 13-2911. Dismissal is otherwise Denied.

IT IS FURTHER ORDERED that the Motion to Exceed Page Limit in Response to DKT 94 Motion to Dismiss (Doc. 113) is Granted.  The Clerk of Court is directed to file the document lodged at Doc. 114.

IT IS FURTHER ORDERED that the Motion to Exceed Page Limit in Response to Dkt 108 Motion for Judgment on the Pleadings (Doc. 115) is Granted.  The Clerk of Court is directed to file the document lodged at Doc. 116.

IT IS FURTHER ORDERED that Defendant Yavapai Community College District's Request for Extension of Page Limit for its Reply in Support of the Motion for Judgment on the Pleadings (Doc. 124) is Granted.  The Clerk of Court is directed to file the document lodged at Doc. 125.

IT IS FURTHER ORDERED that the Scheduling Conference is reset for Monday, June 1, 2015, at 11:30 a.m., in Courtroom 601 of the Sandra Day O'Connor United States Courthouse, 401 W. Washington Street, Phoenix, Arizona 85003.  With this modification of date, all other terms and conditions of the Order Setting Scheduling Conference (Doc. 22) remain in full force and effect.

Dated this 1st day of April, 2015.

Paul G. Rosenblatt
United States District Judge

- 46 -