**HARRIS & ASSOC. P.C.**
4204 Timbercreek Cir.
Roswell, GA 30076
678.733.1408
richard.j.harris@azbar.org
Richard J. Harris – #013859

**Warnock, MacKinlay
& Carman, PLLC**
246 S. Cortez Street
Prescott, AZ  86303
928.445.8056 (Prescott)
Kcarman@lawwmc.com
Krista Carman – #021700

Attorneys for Plaintiff/Relator

### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States ex rel. Daniel Hamilton, | CV 12-08193-PCT-PGR |
| Plaintiff-Relator, | **RESPONSE TO MOTION TO DISMISS DKT 94** |
| v. | |
| **Yavapai Community College District** a political subdivision of the State of Arizona**; John Morgan and April Morgan,** husband and wife; **Guidance Academy, LLC,** an Arizona limited liability company; **John L Stonecipher and Amanda Alsobrook,** husband and wife, | **(Oral argument requested)** Assigned to the Honorable Paul G. Rosenblatt |
| Defendants. | |

Relator Daniel Hamilton responds in opposition to the Motion to Dismiss Relator's Third Amended Complaint ("TAC")[1] filed by Defendants Guidance Academy LLC ("GA"), John Stonecipher ("Stonecipher") and Amanda Alsobrook (collectively "Moving Defendants").

### MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Defendants completely miss the plain theory of liability under the FCA; Defendants Helicopter program never met the 85/15 Rule.  Dkt 82 ¶¶ 63, 71, 79.  VA told them they were out of compliance from Spring 2010 through Fall 2011 but Defendants never returned any

---

[1]Although the pleading is titled "Third Amended Complaint," it is actually the first time Relator's Complaint has been amended to correct any defect in the pleading.

of the money VA paid them while they were in violation of the 85/15 Rule. Thereafter, in an effort to cover up their non-compliance, Defendants began to count ineligible students toward the 15% non-supported enrollment required to qualify for VA funding. But they cannot count students who were not admitted to the Program; students who were not taking flight classes; students who were learning to fly airplanes *not* helicopters; students who were receiving disqualifying aid from GA (employee assistance or scholarships that were not equally available to veterans); or high-school students and others with different attendance requirements and different learning objectives that had nothing to do with piloting helicopters. (Even if the Court approves of Defendants enrolling GA employees and giving scholarships to non-veteran students – which the Court should not do – Defendants still did not comply with several other limitations of the 85/15 Rule, not the least of which is counting students who did not take any flight course). By never complying with the 85/15 Rule, GA caused YC to submit false or fraudulent claims and make and use false statements of certification for every veteran in the Helicopter Program every term from Spring 2010 forward. Moreover, GA invoiced YC for veteran students' flight hours that GA refused to provide, thereby causing YC to submit false claims thereon to VA. When Defendants realized Relator posed a threat to their ongoing fraud on VA, they retaliated against him. Stonecipher and GA pressured YC to fire Relator and YC did so. Finally, because Stonecipher directed the illegal actions of GA, he is personally liable (as is his marital community) under the FCA. Accordingly, the TAC states claims against Moving Defendants for violations of the FCA and for interfering with his contractual relationship.

## PLEADING STANDARDS

Although Defendants fail to invoke any Rule as a basis to dismiss Relator's TAC, Relator presumes Defendants move to dismiss under F.R.Civ.P 12(b)(6) and or 9(b).

## I.    F.R.CIV.P. RULE 12(b)(6)

In deciding a motion to dismiss under Rule 12(b)(6), a court must construe the facts alleged in the complaint in the light most favorable to the drafter of the complaint and the court must accept all well-pleaded factual allegations as true. *See Shwarz v. United States*,

234 F.3d 428, 435 (9th Cir. 2000); *US v. Bollinger Shipyards, Incorporated*, – F3d. –, 2014 WL 7335007 (5th Cir. 2014)("district court erred by improperly weighing the evidence, by focusing on facts the United States did not plead rather than the inferences that the pleaded facts supported, and by viewing the facts in the light most favorable to [the Defendant]").

In addressing a motion to dismiss, the Court must determine whether the factual allegations in the complaint, together with all reasonable inferences, state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint need only contain enough factual content "to raise a reasonable expectation that discovery will reveal evidence" of the claim. *Bell Atlantic Corp.v. Twombly*, 550 U.S. 544, 556 (2007).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal, supra* (quoting *Twombly*, *supra*). "[T]he plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation of a defendant's words, gestures, or conduct. Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible." *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 189-90 (2d Cir. 2012) *cert. denied*, 133 S. Ct. 846 (U.S. 2013). "If there are two alternative explanations [of the facts alleged], one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011), *cert. denied*, 132 S.Ct. 2101 (2012). Accordingly, Relator "need not rule out all possible innocent explanations." *In re Automotive Parts Antitrust Litigation*, 2014 WL 840272 (ED Michigan 2014).

Defendants repeatedly argue the TAC does not foreclose every potential factual variation that could support a different plausible explanation for certain events (e.g., Dkt 94, pp. 7-8). But the plausibility requirement does not require a plaintiff to plead around every potential affirmative defense. *Oliver v. In-N-Out Burgers*, 286 F.R.D. 475, 478 (S.D. Cal. 2012) (citing *U.S. v. McGee*, 993 F.2d 184, 187 (9th Cir. 1993)). The fact that lawyers can now posit hypothetical fact scenarios which, if true, might support plausible affirmative

1  defenses down the road does not render the pleading implausible.

2  **II.    F.R.CIV.P. RULE 9(b)**

3      F.R.Civ.P. Rule 9(b) provides that "[i]n alleging fraud or mistake, a party must state

4  with particularity the circumstances constituting fraud or mistake." *Id*.  However, "Malice,

5  intent, knowledge, and other condition of mind of a person may be alleged generally." *Id.*

6      Rule 9(b) requires only that the TAC give Defendants "notice of the particular

7  misconduct which is alleged to constitute the fraud charged so that they can defend against

8  the charge and not just deny that they have done anything wrong."  *US ex rel. Lee v.*

9  *SmithKline Beecham, Inc.*, 245 F. 3d 1048, 1052 (9th Cir. 2001).

10              **STATUTORY AND REGULATORY FRAMEWORK**

11  **I.    THE FALSE CLAIMS ACT**

12      **A.    Generally**

13      Recognizing that the Government lacks the resources to closely monitor the myriad

14  uses of federal funds, Congress enacted the FCA's *qui tam* provision to allow private

15  persons, termed "relators," to "aid the rooting out of fraud," *U.S. ex rel. Grubbs v.*

16  *Kanneganti*, 565 F.3d 180, 184 (5th Cir. 2009).  The FCA is "intended to reach all types of

17  fraud, without qualification, that might result in financial loss to the Government."  *U.S. ex*

18  *rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006)(quoting *U.S. v.*

19  *Neifert-White Co.*, 390 U.S. 228, 232 (1968).

20      **B.    Scienter under the FCA**

21      Moving Defendants' primary contention is that Relator failed to sufficiently plead

22  scienter under the FCA (and Rule 9(b)).  Accordingly, a detailed exposition of pleading

23  scienter and Relator's allegations of scienter is appropriate at the outset.

24      Under the FCA, a person acts with the requisite scienter when they act "knowingly."

25  The statute expressly defines "knowingly" very broadly to include not only actual knowledge,

26  but also deliberate ignorance or reckless disregard for the truth or falsity of information.[2] 31

27  _____

28  [2]"Knowledge" goes to "information" therefore, scienter is satisfied by alleging
    knowledge as to the falsity of statements or falsity (or fraudulent nature) of claims.

4

1    U.S.C. § 3729(b).  Specific intent to defraud the government is not required.  *Id.*  Moreover,

2    scienter "may be inferred from all the facts and circumstances surrounding the defendant's

3    actions. *U.S. v. Swinton*, 75 F.3d 374, 380 (8th Cir. 1996) (under 18 U.S.C. § 1344).

4         As discussed above, Rule 9(b) expressly states that scienter need not be pled with

5    particularity, and need only satisfy the Rule 8 plausibility standard.  Fed.R.Civ.P. 9(b); *U.S.*

6    *v. Bollinger Shipyards, Inc.*, — F.3d —, 2014 WL 7335007, at *4 (5th Cir. 2014) (district

7    court erred because it "did not consider the circumstantial evidence and general allegations

8    of Bollinger's knowledge and intent" and "by viewing the facts in the light most favorable

9    to [defendant] and drawing inferences against the [plaintiff]" (internal quotation omitted)).

10        Defendants repeatedly argue that Relator cannot allege sufficient scienter because GA

11   "reasonably continues to believe that its programs do comply with Regulation 4201," (Dkt

12   94, p. 2:17-20).  *Id.* at p. 6:9.  Somewhat inconsistently Defendants also claim the regulations

13   are ambiguous.   Dkt 94, pp. 13:26, 14:23-24.   But Defendants never disclose the

14   interpretation they had of the regulations so the reasonableness of their interpretation can be

15   analyzed.  Nor do Defendants analyze Relator's straight-forward reading of the 85/15 Rule

16   regulations to point out specifically why it is "idiosyncratic," "a red-herring," an

17   unreasonable "legal conclusion," an overly "narrow interpretation," or "conclusory" (*id.* at

18   p. 6) such that it should be ignored by the Court.

19        The only potential relevance of any purported ambiguity is whether the particular

20   defendant believed in good faith that its interpretation was correct or "reasonable."[3]  *See*

21   *Oliver* 195 F.3d at 463-64; *U.S. v. Cooperative Grain and Supply Co.*, 476 F.2d 47, 59-60

22   (8th Cir. 1973).  However, if a defendant believes the regulation is confusing, it has a duty to

23   seek clarification of the perceived ambiguity. *Heckler v. Community Health Servs*, 467 U.S.

24   51, 64 (1984); *Visiting Nurse Assoc. v. Thompson*, 378 F. Supp. 2d 75, 95 (E.D.N.Y. 2004)

25

26   [3]As a preliminary point, ambiguity of a contractual or statutory provision has no
     bearing on the **falsity** of the claims submitted.  Falsity is determined objectively based on
     the Court's interpretation of the provisions at issue. *U.S. ex rel. Oliver v. The Parsons*
27   *Co.*, 195 F.3d 457, 463 (9th Cir. 1999) (district court "erred in applying a 'reasonable
     interpretation' approach to determining falsity under the [FCA]"), *cert. denied,* 530 U.S.
28   1228 (2000).

(citation omitted; a defendant cannot simply hide behind the general "abundance of confusion and misdirection" surrounding a regulation).  The FCA's scienter standard has long contemplated such a duty to inquire. *Cooperative Grain*, 476 F.2d at 59-60 (FCA scienter is established where an honest (but incorrect) belief in the truth of regulatory compliance was the product of failure to exercise reasonable care to ascertain what the regulatory requirements were – i.e. reckless disregard); S. Rep. No. 99-345, at 20 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5285 ("In fashioning the appropriate standard of knowledge for liability under the False Claims Act, S. 1562 [the proposed 1986 False Claims Act amendments] adopts the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek"); *Seibert v. Gene Security Netwok, Inc.*, — F. Supp. 3d —, 2014 WL 6765835, at *7-8 (N.D. Cal. 2014)(collecting FCA cases supporting the "general principle that those who submit claims to the government for reimbursement may be acting in reckless disregard as to the truth or falsity of their submissions if they fail to take steps to confirm the accuracy of those submissions," including satisfaction of their "duty to familiarize themselves with the legal requirements for payment," quoting *U.S. v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001)).  By itself, the duty to inquire creates a plausible inference that any defendant who violates a regulation it considers "vague" or "ambiguous" acts with reckless disregard unless they inquired of the regulatory agency regarding the proper interpretation.

The Ninth Circuit's recent decision in *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112 (9th Cir. 2014), is in accord with the foregoing principles.  In that case, the defendant obtained dismissal based on its reasonable (even if incorrect) belief that it was complying with the regulations.  But Planned Parenthood satisfied its duty to inquire. It described its billing practices and rationale to the governing agency and the government conceded that conflicting, unclear and ambiguous representations had been made to providers regarding billing compliance. *Id.* at 1115.  Under those circumstances the defendant could not have acted with reckless disregard for whether its claims were truthful. *Id.* at 1116.  The present case, however, presents a contrary situation.  Moving Defendants, are not alleged to

have sought clarification on compliance (at any point) from VA.  On the contrary, VA told YC and GA that they had to comply with 85/15 and required them ***each*** to certify their knowledge of that requirement in October 2010.  Dkt. 82 ¶192.  Far from candid disclosure of their rationale, Defendants still avoided disclosing their 85/15 accounting altogether until Fall 2011.  Dkt 82 ¶63.  Defendants continued their same practices which violated the 85/15 Rule until June 2011 when VA informed the Helicopter Program that from Spring 2010 and Summer 2011 it "has not followed the 85 percent enrollment limitation."  Dkt. 82 ¶191(a). In July 2011, the Dean of the YC/GA Helicopter Program acknowledged that VA had informed them that compliance audits would only include students in actual aviation classes. Dkt. 82 ¶74.  If any Defendant disagreed with VA's interpretation of the regulation (as Morgan apparently did and as Moving Defendants now claim to) they should have informed VA, explained their interpretation of the regulations and sought clarity (as did the defendant in the *Planned Parenthood* case).  But Defendants did not.  Instead of clarifying how to comply, YC and GA sought (but failed to obtain) a waiver from VA – not to comply with, but to avoid complying with VA regulations.  Dkt 82 ¶203, 206.  Their failed effort to get forgiveness is not evidence of an effort or intent to comply in the first place.  Indeed, while they knew they were out of compliance and were seeking a waiver, the Helicopter Program repeatedly and falsely certified that Defendants were in compliance in dozens of claims submitted.  Dkt 82 ¶207.  The fact that they were seeking a waiver creates a strong inference that Defendants knew their concurrent compliance certifications were false.

In the present case, the factual allegations taken as true support the reasonable inference that Defendants acted at all times with at least reckless disregard to the truth that they were not in compliance with the 85/15 Regulations.  As shown hereafter, Relator can identify by name and can total which students were supported and which were not from the first term that the program was offered, Spring 2010.  If Relator can do it, so could Defendants.  Their failure to correctly do so was at least reckless and perhaps intended despite actual knowledge in order to get claims submitted and paid.  Certainly Defendants knew, not later than October 2010 that GA was required to comply with the 85/15 Rule

within the flight course it provided and that GA and YC were not in compliance at that time. Dkt. 82 ¶192.  Certainly Defendants knew on June 22, 2011 that VA disapproved of their compliance efforts between Spring 2010 and Summer 2011. Dkt 82, ¶191.  *U.S. ex rel. K&R Ltd. v. Mass. Housing Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008) (evidence of a prior warning of noncompliance may show that the defendant was reckless, rather than merely negligent, when it submitted ineligible claims).  Certainly Defendants knew in July 2011 that VA interpreted the regulations to prohibit counting students in non-aviation classes.  Dkt 82, ¶191.  *Minn. Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002)(if defendant knew how the agency interpreted the regulations, and knew that its actions did not satisfy that interpretation, then "any possible ambiguity of the regulations is water under the bridge.").  Furthermore, Defendants' efforts to seek a waiver supports the inference that they knew of the agency's interpretation and knew that they were not in compliance with that interpretation. Dkt 82, ¶¶192-207.[4]  Nothing in the TAC, nor even in the Defendants' brief, suggest VA acknowledged any ambiguity in the regulations.  Thus, Defendants' claim of ambiguity is belied by (1) their failure to inquire regarding any ambiguity; (2) VA's findings of non-compliance; (3) VA's demands for compliance; and (4) VA's specific communications warning against counting non-aviation students.

Any claim of ambiguity is also belied by Defendants' wholesale failure to either articulate the ambiguity or offer some interpretation of the regulations at issue which would be consistent with their claims of compliance with the 85/15 Rule.  There is no allegation supporting a conclusion that Defendant thought the regulations were ambiguous when they violated them.  Only now, after an FCA complaint has been filed, do Moving Defendants' attorneys make the *post-hoc* assertion that the regulations were ambiguous.  And even then, Moving Defendants' attorneys stop short of articulating any ambiguity or interpretation of the regulations that is consistent with Defendants complying with the 85/15 Rule.

Ultimately, the issue is whether Defendants had a good faith belief in their reasonable

---

[4]GA's argument that it had nothing to do with the 2011 waiver request is belied by the fact that the waiver was sought for the Helicopter Program that was GA's joint venture with YC.  Dkt 82, ¶204. GA had everything to do with the waiver.

1 interpretation of the regulations, or whether they had reckless disregard for the regulatory

2 requirements.  Resolution of those issues is premature at the pleading stage.

3 **II.    THE VA's 85/15 RULE AND ITS PURPOSE**

4 Pursuant to the Post 9/11 GI Bill, VA pays for qualifying veterans to pursue a college

5 degree. VA regulations only allow funding for veterans if fewer than 85% of the students in

6 the same course are supported by VA or by the educational institution.

7 (a) General. Except as otherwise provided in this section the Department of
Veterans Affairs shall not approve an enrollment in any course for an eligible

8 veteran, not already enrolled, for any period during which **more than 85
percent** of the **students enrolled in the course** are **having all *or part* of their**

9 **tuition, fees or other charges paid for them *by the educational institution***
**or by VA** under title 38, U.S.C., or under title 10, U.S.C. This restriction may

10 be waived in whole or in part. 38 C.F.R. § 21.4201(a)(emphasis added).

11 The 85/15 Rule was created to protect the federal fisc.  It infuses free market

12 competition in order to avoid abuses under the GI Bill. "[I]f an institution of higher learning

13 cannot attract sufficient nonveteran and nonsubsidized students to its ***programs***, it presents

14 a great potential for abuse of our GI educational programs." *Cleland v. Nat'l College of*

15 *Business*, 435 U.S. 213, 98 S.Ct. 1024 (1978)(citing S.Rep.No. 94-1243, p. 89 (1976)(Senate

16 Report); U.S.Code Cong. & Admin.News 1976, p. 5311)(emphasis added).   Congress

17 recognized the risk of abuse when, as here, a public college partners with a private school

18 in an attempt to circumvent the law.  "[A] number of instances have been brought to our

19 attention which represent abuse of our educational programs. Some of these cases involved

20 contracting between non-profit schools and profit schools . . . ." *Id*. (Citing S.Rep.No.

21 94-1243, p. 129 (1976)(Senate Report); U.S.Code Cong. & Admin.News 1976, p. 5351).

22 It is as though the Courts and Congress foresaw the GA/YC Helicopter Program.  By

23 2013, flight fees and tuition in the Helicopter Program were as high as $100,000.00 per

24 student per term and they always eclipsed the relatively low cost of non-flight class tuition.

25 Yet Defendants claim that in each term they can enroll as many as 6 students in flight courses

26 (each able to bring Defendants over $100,000.00 in tuition and fees from VA) if they enroll

27 just one GA employee (at GA's expense) in a non-flight class costing as little as $261.00 in

28 tuition (See, Dkt 82.1 EX A, pp. 35-36 showing Fall 2013 tuition and fees for Joshua Warner

9

1  and Kevin Yip of $101,641.00 compared to Christopher Rochelle who had tuition of only

2  $261.00 in Fall 2010).  Holding firm on the 85/15 Rule is the only way to protect the

3  government and taxpayers from being fleeced with impunity.

4      Because the very purpose of the 85/15 Rule is to prevent fraud, the Rule should be

5  construed broadly so as to accomplish that purpose.  "As in all cases of statutory

6  construction, our task is to interpret the words of [the statute] in light of the purposes

7  Congress sought to serve." *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 103 S.Ct.

8  986, 990, 74 L.Ed.2d 845 (1983) (citing authorities).  "When faced with a problem of

9  statutory construction, this Court shows great deference to the interpretation given the statute

10 by the officers or agency charged with its administration.... When the construction of an

11 administrative regulation rather than a statute is in issue, deference is even more clearly in

12 order." *Kahn v. INS*, 36 F. 3d 1412, 1421 (9th Circuit 1994)(Citations omitted).

13                                      **ARGUMENTS**

14 **I.    COUNTS I AND II STATE CLAIMS FOR VIOLATIONS OF THE FCA**

15     The TAC presents two distinct factual bases for liability under Counts I and II.  The

16 first is based on Defendants' multiple violations of the 85/15 Rule from Spring term 2010

17 forward.  The second is based on overbilling VA for flight hours that were not delivered as

18 represented.  Violating the 85/15 Rule renders "false or fraudulent" every claim that is based

19 on compliance with the Rule and every statement submitted in support of a claim.  Charging

20 VA fees for flight hours that were never provided renders "false or fraudulent" every claim

21 for such flight fees.  Moreover, the allegations of the TAC support the inference that

22 Defendants acted knowingly (as that is defined in the FCA).

23     **A.    Elements Of Cause of Action under Counts I and II**

24     A violation of 31 U.S.C. § 3729(a)(1)(A) requires "(1) a false or fraudulent claim (2)

25 that was material to the decision-making process, (3) which defendant presented, or caused

26 to be presented, to the United States for payment or approval (4) with knowledge that the

27 claim was false or fraudulent. *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1047 (9th

28 Cir. 2012). A violation of § 3729(a)(1)(B) requires a showing the "defendants knowingly

                                          10

made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim." *Id*. In this case, because the prerequisites for liability on Count I and Count II are so similar (the only difference being whether Defendants submitted/caused to be submitted a false claim or made/caused to be made a statement material to such a claim), the Court can address the mandatory elements of each together. *U.S. ex rel. Kozak v. Chabad-Lubavitch Inc.*, 2014 WL 6943944 (E.D. Cal. 2014).

Defendants do not dispute the sufficiency of allegations that claims were submitted or that each claim contained statements certifying compliance with the regulations. Dkt 82 ¶¶63-67. Nor do Defendants dispute the adequacy of pleading materiality. Dkt 82 ¶70. Indeed, Defendants never really dispute that Relator has alleged falsity of their certifications or claims based on violations of regulations governing 85/15 or the falsity of their overbilling of flight fees. They do suggest that there might be more favorable interpretations of the regulation, but they fall far short of providing that alternative interpretation. In the end, Defendants rely solely on their conclusory accusation that Relator failed to allege scienter with particularity and an allegation that the TAC fails to allege that Guidance *caused* YC to use false records or to present false claims. As shown below, these elements have been adequately alleged to support claims against Moving Defendants.

**B.    Moving Defendants Knowingly Caused YC to Make False Statements (Certifications of Compliance) and to Submit False or Fraudulent Claims Because GA Never Complied with VA's 85/15 Rule.**

**1.    Falsity. Every certification of compliance was false and every claim to VA was false or fraudulent because Defendants' Helicopter Program never complied with the 85/15 Rule.**

The TAC demonstrates how Defendants failed to comply with 85/15 each term. The TAC references applicable regulations (Dkt 82 ¶¶ 23-40); applies them to Defendants' list of flight program students (Dkt 82.1); and explains in detail, term by term, which students can and which students cannot be counted toward compliance with the 85/15 Rule. Dkt 82 ¶¶79-189. The TAC details how Defendants' non-supported enrollment never reached the minimum 15% threshold required to get VA funding. Relator alleges that Defendants fell short of 15% non-supported enrollment in Spring 2010 because 100% of the enrollees were

VA supported (TAC ¶86(b)).  Relator alleges exactly how Defendants fell short of 15% non-supported enrollment every subsequent semester through 2013.  (Dkt 82 ¶¶96(d); 105(d); 114(d); 122(d); 130(d); 139(d); 148(d); 155(d); 164(d); 173(e); 182(e)).  To overcome relator's allegations of falsity at the pleading stage, Defendants would have to show from the allegations of the TAC that additional flight students were (or could have been) counted as non-supported sufficient to exceed 15% non-supported enrollment.  Defendants have not attempted to do so because the attempt would be futile.[5]

The TAC details how Defendants could not have purported to meet the 85/15 ratio without including as "non-supported" certain students who should have been excluded.  Such students had to be excluded because they: were not enrolled in the same (or any) flight course; were not taking any helicopter flight courses through GA; were supported by GA as employees; were receiving disqualifying financial support from GA/YC scholarships; were from other concentrations (e.g. JTED, and NorthAire fixed wing students); or had different course requirements (including different attendance requirements).  Dkt. 82, ¶¶ 87, 97, 106, 115, 124, 131, 140, 149, 156, 165, 174, and 183.  The regulations governing 85/15 compliance prohibit counting such students in compliance calculations.

Defendants' motion does not dispute Relator's analysis; does not provide any alternative legal authority contradicting Relator's application of the regulations; nor does it even suggest any rational basis to apply the regulations differently.  GA makes the conclusory argument that Relator applies a "narrow interpretation of the regulation" (Dkt 94, p. 7:11-13) but GA does not offer any broader view of the regulation that would justify its enrollment of over 85% VA supported students into GA's helicopter course.

        **a.**    **Regulations Prohibit Defendants From Counting Non-Helicopter Flight Students Toward Compliance with 85/15**

The regulations regarding how to calculate 85/15 compliance are comprehensive and

---

[5]Because Defendants dispute the illegality of GA employee enrollment, GA/YC scholarships and JTED enrollment, Relator's calculations of compliance in the TAC do not rely on disqualifying any student on the basis that the student was part time, was a GA employee, that the student received financial support from the GA/YC scholarship program, or that the student was part of the JTED program.

designed to close loop-holes that might circumvent the purpose of having at least 15% of students in the same course of study paying their own way without support from VA or the institution. For this reason, several VA regulations prevent Defendants from counting non-flight and non-helicopter flight students as well as GA employees and recipients of GA scholarships toward Defendants' Helicopter Program's compliance with the 85/15 Rule.

First and foremost, the basic regulation on 85/15 Rule compliance only allows comparison of students "enrolled in the course." 38 C.F.R. § 21.4201(a). Students who are not enrolled in GA's helicopter pilot certification course, cannot count toward compliance.

Secondly, and more specifically, each sub-contracted portion providing a flight course must, by itself, meet all the requirements of the 85/15 Rule. The regulations very clearly require any subcontracted portion of a flight course to separately comply with the 85/15 Rule:

> Enrollment limitations. A flight course must meet the 85-15 percent ratio requirement set forth in § 21.4201 before VA may approve new enrollments in the course. ***The contracted portion of a flight course must meet all the requirements of § 21.4201 for each subcontractor***.

38 CFR § 21.4263(l)(emphasis added). Thus, non-supported students who are not in a subcontracted flight training course cannot count toward compliance of the subcontracted portion of a flight program. Accordingly, GA cannot count non-helicopter flight students toward its compliance with 85/15. And GA knew this; VA specifically required GA to certify that it would comply with 85/15 within its helicopter pilot certificate program. Dkt 82, ¶¶192, 193.

Thirdly, separate branches or extensions of the school must each satisfy the 85/15 Rule. 38 CFR §21.4201(e)(1). Thus, non-supported students from any branch or extension other than those at GA's facility cannot be used to qualify supported students at GA's facility. This required Defendants to exclude non-flight and non-helicopter flight students in order to comply with the 85/15 Rule.

Fourthly, in order to count toward compliance, the course requirements for all students included in the calculation must be substantially similar. When a course or curriculum that varies in any way from a similar course, although it may have the same designation as the

other similar course or curriculum, each course will require a separate 85/15 computation. 38 C.F.R. §21.4201(e)(1). A course or curriculum will be considered to vary from another if there are different attendance requirements, required unit subjects are different, required completion length is different, etc. *Id.* Because helicopter pilot flight training is substantially different from other curricula, Defendants can only use students who are taking helicopter flight training to offset VA supported students in GA's helicopter flight training course. These regulatory requirements mean Defendants *cannot* count any of the students in EX A of the TAC who do not have helicopter flight fees associated with them. By failing to comply with these regulations governing the 85/15 Rule, GA caused every YC certification of compliance to be "false" and caused every claim submitted by YC for GA flight fees and tuition to be "false or fraudulent" under the FCA.

### b. The regulations prohibit Defendants from counting all students in the combined AVT program.

In an attempt to circumvent the 85/15 Rule, Defendants put the Helicopter Program under the same name, "AVT" as other aviation programs including non-flight aviation programs. Dkt. 82 ¶¶263-270. Defendants counted students from emphases or objectives other than Helicopter (like AVT(Airplane) or AVT(Operations and Management)) to offset VA supported enrollment in GA's helicopter flight course. *Id.* But AVT students in other emphases/objectives than Helicopter are also not enrolled in the same flight course that AVT(Helicopter) students enroll in with GA and therefore cannot count toward 85/15 compliance under 38 C.F.R. § 21.4201(a). As shown above, the fact that these non-Helicopter-emphasis AVT students have different requirements and do not take classes within GA's subcontracted flight course precludes them from offsetting VA enrollment in GA's helicopter course pursuant to 38 C.F.R. §21.4201(e)(1).

But there is also a regulation specifically addressing how to count AAS degree students with different objectives. 38CFR §21.4201(e)(1)(i)(A). For Associate of Applied Science degree courses where a field is specified, 85/15 compliance must be computed separately for each objective. Thus, non-supported students in one objective (e.g. AVT

(Operations and Management)) cannot be used to offset enrollment of supported students in another objective (e.g. AVT (Helicopter)).  By using non-helicopter AVT students from Summer 2013 forward to offset GA's VA supported enrollment, GA failed to comply with at least three regulations under the 85/15 Rule thereby causing every YC certification of compliance to be "false" and causing every claim submitted by YC for GA flight fees and tuition "false or fraudulent" under the FCA.

Moving Defendants suggest that the regulations are subject to different interpretation. However, once again, Defendants stop short of suggesting any different interpretation that would allow GA to count students from other AVT objectives/emphases or that would relieve GA of its obligation to comply with 85/15 within the subcontracted helicopter flight course it provided.  The regulations are not rendered ambiguous merely by Defendants calling them ambiguous.  Moreover, ambiguity is not a defense to falsity.  *Oliver,* 195 F.3d at 463.

### c.    VA regulations prohibit Defendants from counting students in the JTED program.

Defendants cannot count JTED students to offset veteran enrollment in the YC/GA Helicopter Program.  JTED students are not enrolled in the flight course that Helicopter Program students enroll in with GA and therefore cannot count toward 85/15 compliance under 38 C.F.R. § 21.4201(a).  In addition to the fact that JTED students do not take any helicopter flight training (Dkt. 82 ¶278) they cannot be included because they have different eligibility, enrollment, attendance, and objective requirements (*id.*) and must be excluded per 38 C.F.R. §21.4201(e)(1).  Indeed because it is a high-school program, veterans are not even eligible to participate in the JTED program.  Moreover, JTED students are supported by YC and therefore cannot be counted as non-supported at all.  As alleged in the complaint, JTED students had tuition waived (financial support not equally available to veterans).  Dkt. 82 ¶276.  By using JTED students from Fall 2013 forward to offset GA's VA supported enrollment, GA failed to comply with the 85/15 Rule thereby causing every YC certification of compliance to be "false" and causing every claim YC submitted for GA flight fees and tuition to be "false or fraudulent" under the FCA.

1          **d.    VA regulations prohibit Defendants from counting as "non-supported" any student not enrolled in the Helicopter Program.**

2

3          Defendants cannot count the many students identified on EX A to the TAC who were

4    not even admitted into the Helicopter Program.  Dkt 82, ¶¶87(b); 97(b); 106(b); 115(b);

5    165(c).  The 85/15 Rule only permits comparison between students enrolled in the same

6    course.  38 C.F.R. § 21.4201(a).

7          **e.    VA regulations prohibit Defendants from counting as "non-supported" GA employees whom Stonecipher had GA enroll in non-flight courses at GA's expense.**

8

9          After being found in violation of the 85/15 Rule, Defendants developed a plan for GA

10   to pay to enroll non-veteran employees into YC non-flight classes, but to count them as "non-

11   supported" to VA.  Dkt 82 ¶¶208-249.  There are many reasons why Defendants cannot count

12   as "non-supported flight students" those GA employees who were enrolled in the Helicopter

13   Program.  First and foremost, none of the GA employees took any helicopter flight courses

14   with GA.  Dkt 82 ¶¶ 131(a), 140(a), 149(b), 156(a), 165(b).  As discussed above, under VA

15   regulations non-helicopter and non-flight students cannot be compared to students taking

16   GA's helicopter flight course.  Also, GA employee students cannot be compared to other

17   students because unlike the other students, GA employees were told they did not have to

18   regularly attend classes and thus had a different attendance requirement than other students

19   in the same courses.  Dkt 82¶131(b).  38 C.F.R. §21.4201(e)(1).

20         Moreover, because GA paid for non-veteran employees to enroll (but not for veteran

21   employees), counting employees as non-supported violates the basic prohibition against

22   counting as non-supported any students who have any part of tuition or fees paid by the

23   educational institution.  Relator made a similar claim in his FAC which the Court dismissed

24   finding that, as alleged, the policy to require all employees to have or pursue a degree in

25   aviation was facially neutral and therefore applied to veterans and non-veterans equally,

26   triggering an exception to the institutional support prohibition.  Dkt 74, pp. 12:21-13:10

27   (citing CFR § 21.4201(c)(2)(iv)).  The TAC clarifies that GA's stated policy to require every

28   employee to pursue an aviation degree was not its actual policy.  Dkt 82, ¶¶208-241.  The

16

1  stated policy was a false statement that may create the impression of a neutral policy to

2  support veterans and non-veterans alike, but nothing could be further from the truth.[6]

3      In fact, the policy was for Stonecipher and GA to selectively enroll only non-veterans

4  and only as many as were needed to offset veteran enrollment at the 85/15 level.  Dkt 82

5  ¶¶222-226.  Indeed, they actually prohibited some veteran employees from pursuing a degree

6  in aviation in direct violation of the supposed "policy."  Dkt 82 ¶¶218-219, 222.  And

7  Stonecipher did not allow GA to pay for tuition and fees for GA employee-veterans, Jason

8  Martin and James Schneider, who were enrolled in the Helicopter Program.  Dkt. 82 ¶231.

9  So the actual policy was not neutral as the stated policy.  It did not make benefits equally

10  available to non-veteran and veteran employees (and certainly not to non-veteran and veteran

11  students) alike.  Stonecipher and GA's use of a false policy statement (which, if believed,

12  might be exculpating) is nothing more than another violation of the FCA: making a false

13  statement material to a false or fraudulent claim.

14            **f.**      **VA regulations prohibit Defendants from counting as "non-**

15                    **supported" students who received GA funded scholarships.**

16      Like the GA employee enrollment scheme, Defendants cannot count as non-supported

17  the students who received scholarship money from YC and GA because it was not available

18  equally to veterans and non-veterans alike.  ¶¶242-249.  As the entity funding the money, GA

19  required that it not be given to those eligible for VA benefits (i.e. veterans).  ¶243.  It was

20  therefore never intended to be available to veterans and non-veterans alike.  As the chair of

21  the committee awarding the money, Relator knew that it was not available equally to veterans

22  and non-veterans alike.  ¶244.  One recipient openly commented that he knew the scholarship

23  was not intended to be equally available for veterans and non-veterans alike.  ¶247.  Because

24  GA's scholarship money was not equally available to veterans and non-veterans alike, every

25  claim submitted and every certification of compliance made on GA's behalf was false for any

26  term that such students were counted as non-supported.

---

27        [6]Even at face value, the policy does not make GA's financial support available to
veteran and non-veteran students alike.  At best it makes those benefits available only to

28  those people GA hired and not to any other students: veteran or non-veteran.

**2.    Causation – Moving Defendants Caused YC to Violate the FCA.**

GA and Stonecipher caused YC to submit false or fraudulent claims and false certifications to VA.  The prohibition on causing another to use a false statement or submit a false or fraudulent claim, as set forth in 31 U.S.C. § 3729 (a)(1)(A) and (B), extends the FCA's reach to "any person who knowingly *assisted in* causing the government to pay claims which were grounded in fraud. . . ." *US v. Mackby*, 261 F. 3d 821 (9ᵗʰ Cir. 2001)(citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 544-45, 63 S.Ct. 379, 87 L.Ed. 443 (1943))(superseded by statute on other ground as recognized by *Graham County Soil & Water Conservation Dist. v. United Stated ex rel. Wilson*, 559 U.S. 280 (2010))(italics in original *Mackby*).  Stonecipher and GA assisted YC by knowingly: delivering a subcontacted flight course that did not comply with 85/15 (Dkt 82 ¶71) and by authorizing and creating invoices on which YC could base its false statements and claims to VA (Dkt 82 ¶ 69).  Without GA's flight school there would have been no Helicopter Program for which to submit any claims to VA.  Without GA's invoices to YC for flight fees (and tuition) there would be no basis for claims YC submitted to VA.  GA was so integral to YC's submission of false or fraudulent claims that the two entered into an agreement to provide the very Helicopter Program for which the false or fraudulent claims were submitted.

**3.    Scienter**

As discussed above, Defendants either (1) actually knew that fewer than 15% of their students were legitimately non-supported or (2) they were deliberately ignorant to that fact (which their own records support), or (3) they were reckless in their disregard for what the truth was and simply claimed to be in compliance when their own records showed they were not.  Nevertheless, Stonecipher and GA gave YC invoices which they knew YC was submitting to VA for payment.  Dkt 82 ¶¶ 292-293. See, *supra*, "**Scienter under the FCA.**"

**C.    Moving Defendants Knowingly Caused YC to Submit False or Fraudulent Claims Because GA Caused YC to Bill VA for Flight Fees GA never Provided.**

The TAC alleges two ways GA caused YC to submit false or fraudulent claims for flight hours GA did not provide.  First, Stonecipher and GA stopped providing all promised

18

flight hours in a course once students passed the course requirements.  Dkt 82 ¶¶ 281-291.  But Stonecipher had GA bill YC for all the flight hours, knowing YC would pass the bills on to VA for payment.  Dkt 82 ¶¶ 292-293. Secondly, Stonecipher and GA refused to provide more than about half the flight training hours to veterans who repeated a flight class.  Dkt 82, ¶¶ 293-306.  But GA still invoiced YC the fees for all flight hours.  Dkt 82 ¶300.

In other words, Stonecipher and GA violated the FCA by seeking and receiving payment for "services not actually rendered."  *U.S. ex rel. Ruhe v. Masimo Corp.,* 977 F.Supp.2d 981, 990 (C.D. Cal. 2013) (*citing U.S. ex rel. Hopper v. Anton,* 91 F.3d 1261, 1265 (9th Cir. 1996)); *Lee*, 245 F. 3d at 1053 (Recognizing a cause of action under the FCA for "seeking and receiving payment for medically worthless tests").  Stonecipher and GA either knew how much they were billing and what flight hours GA was providing or they acted in reckless disregard to their own records that would show they were overbilling.

Defendants dispute only the scienter element of Relator's claims arising from overbilling flight fees. Ignoring the above referenced allegations, Defendants state: "Plaintiff does not allege facts tending to show that Guidance knowingly submitted false overbilling to YC, let alone with the intent that YC use the information to submit a false or fraudulent claim." Dkt. 94 p. 13:13-15.  But Relator has alleged that both Stonecipher and GA knew that hours were not being provided.  In fact, in both instances Stonecipher forbade GA from providing the full number of hours. Dkt 82, ¶¶282, 297. Relator has alleged that Stonecipher caused GA to bill YC for the full number of flight hours.  Dkt 82, ¶293.  Therefore both he and GA knew that GA was billing YC.  Moreover, the TAC alleges Stonecipher and GA knew YC was forwarding the claims on to VA for payment.  *Id.*  These facts fairly compel the conclusion that Stonecipher and GA knowingly submitted overbilling to YC.

In any event, Defendants know now and therefore (as shown in the next section) have a duty to repay amounts obtained by causing YC to submit false claims for flight hours.  However, as alleged, "Neither GA nor YC refunded to VA or the students the amounts paid for flight hours that were not delivered."  Dkt 82, ¶306.

19

## II.    COUNT III – REVERSE FALSE CLAIM VIOLATION[7]

Relator alleges Defendants knowingly and improperly avoided an obligation to repay overpayments made by the Government for veterans enrolled in GA's flight course portion of the Defendants Helicopter Program (Dkt 82, ¶¶323-324) including payments made for flight hours that were never provided.  Dkt 82, ¶306.  Relator even told fellow Helicopter Program representatives that amounts overpaid for flight fees would have to be refunded. Dkt 82, ¶303.  Whether all Defendants knew it at the time or not, they now know these payments were based on false statements and false claims.

Defendants assert Relator failed "to plead facts sufficient to establishing (sic) that Guidance has any liability to return alleged overpayments to the VA."  Although properly quoting 31 U.S.C. § 3729(a)(1)(G), Defendants ignore the import of the 2009 Amendments which added the final clause imposing liability on anyone who "knowingly conceals or ***knowingly and improperly avoids*** or decreases ***an obligation to pay*** or transmit ***money*** or property ***to the Government***."  *Id.* (Emphasis added).[8]  Defendants ignore clear legislative history and baldly pronounce without citation to a single authority that "[t]his statute <u>does not</u> create any liability for an individual to return alleged overpayments." (Doc. 94 at 16:12-13 (emphasis in original)).  But that is exactly what this statute does!

The reverse false claims provision of the FCA closes a loop-hole for persons who have obtained money from the government based on claims they later learn to be false. It should be a matter of common sense that a lack of scienter at the time of submitting a false claim or of using a false statement is not a license to forever retain an overpayment made thereon.  The retention of a known overpayment, by itself, creates an obligation under the

---

[7] The reverse false claim provision of the FCA was greatly expanded in the 2009 FERA amendments and renumbered as (31 U.S.C. § 3729(a)(1)(G)).  Count III does not arise under the pre-FERA version of the FCA (31 U.S.C. § 3729 (a)(7)).  So reverse false claims cases must be scrutinized to ensure they are not applying pre-FERA standards.

[8] The reverse FCA provision is distinct from liability under other FCA provisions because: unlike subsection (a)(1)(A) it does not contain a presentment requirement; and unlike subsection (a)(1)(B) the new clause contains no false record or statement requirement.  *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.* (E.D. Pa., 2014)("The 2009 amendments expanded the . . . reverse-false-claim provision to impose liability for any knowing concealment or avoidance of an obligation, whether or not a false statement or record was made or used in connection with the avoidance").

1  FCA.  In 2009, Congress defined the term "obligation" as including "an established duty,

2  whether or not fixed, arising . . .  from statute or regulation, or from the retention of any

3  overpayment." 31 U.S.C. § 3729(b)(3).  As Congress explained, "the violation of the FCA

4  for receiving an overpayment may occur once an overpayment is knowingly and improperly

5  retained, without notice to the Government about the overpayment." S. Rep. 111-10 at 15

6  published at 2009 U.S.C.C.A.N. 430.

7       Conceding the sufficiency of Relator's alleged facts, Defendants reference 38 C.F.R.

8  § 21.4009 and argue that, even if they now know they received an overpayment from the VA,

9  they have no obligation to return the money because the VA has not made a "'determin[ation]

10 that the overpayment was made as the result of willful or negligent' failure to report or false

11 certification." Dkt 94 at 16.  Defendants' position is unfounded.  Under the FCA, the

12 government need not demand repayment before FCA liability can attach for retention of the

13 overpayment.  *U.S. ex rel. Keltner v. Lakeshore Med. Clinic, Ltd.*, 11-CV-00892 (E.D. Wis.,

14 2013)("If the government overpaid defendant . . . and defendant intentionally refused to

15 investigate the possibility that it was overpaid, it may have unlawfully avoided an obligation

16 to pay money to the government").

17      Defendants misplace their reliance on the regulation entitled "Waiver or recovery of

18 overpayments," 38 C.F.R. § 21.4009(a)(3).  This regulation authorizes VA to recover

19 overpayments if they were the result of negligence.  *Id.*  However, the regulation goes on to

20 say, "[i]f it appears that the falsity or misrepresentation was deliberate, the [VA] may not

21 pursue administrative collection pending a determination whether the matter should be

22 referred to the Department of Justice for possible civil or criminal action." *Id.*  Read in this

23 context, the provision cited by Defendants requiring the VA to make a determination of

24 negligence versus willfulness is nothing more than an administrative step to ensure the VA

25 does not exceed its authority.  Nothing in the regulation, however, precludes an action under

26 the FCA – whether brought by the DOJ or by a relator – to recover the overpayment.  In fact,

27 "Congress intended to allow the government to choose among a variety of remedies, both

28 statutory and administrative, to combat fraud," and therefore the existence of a complex

regulatory scheme whereby an administrative agency might also have authority to recover the same overpayment does not preclude an FCA action. *U.S. ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 415 (8th Cir. 2012).  This conclusion is also consistent with Congress' inclusion of an alternate remedy provision in the FCA. 31 U.S.C. § 3730(c)(5) (even when the Government "elect[s] to pursue its claim through any alternate remedy available to the Government, including any administrative proceeding," the relator shall have "the same rights" s/he would have had if the action had continued under the FCA).

As to FCA scienter concerning a reverse FCA claim, Defendants once again assert Relator made only conclusory allegations that Defendants "kn[e]w that YC and GA have obtained  overpayments."  Dkt. 94  at  16-20-22,  citing  TAC  ¶¶  319-20.    Contrary  to Defendants' selective reading of the TAC, Relator alleged facts showing Defendants knew they retained payments they were not eligible to receive.  First, Defendants cannot deny that VA's findings in June 2011 of non-compliance of the Helicopter Program provided them with actual knowledge that their prior claims for payment were not eligible for payment. Dkt 82, ¶191.  Defendants' failure to repay after June 2011 creates a strong inference of scienter: either reckless disregard, or actual knowledge.

Second, even if Defendants did not act knowingly as to Counts I and/or II, they are still liable under Count III because they now have knowledge "because of their violations of the FCA described above."  Dkt 82 ¶319.  That is to say, whether or not they knew of the violations before Relator's case was filed, they now know.  Accordingly, unless Defendants can defeat Relator's allegations regarding falsity on each and every other violation of the FCA, they cannot defeat knowledge of overpayment.

## III.    COUNT IV – FCA CONSPIRACY

YC and GA are partners and joint venturers in the development and execution of the Helicopter Program. Dkt 82 ¶¶41, 131(c), 140(c), 149(c), 156(a)(ii), 174(b)(ii), 238, 239, 314.  Defendants do not dispute the sufficiency of this allegation or the corollary that they are jointly and severally liable for the actions of each other.  Additionally, YC, GA and their representatives,  Stonecipher  and  Morgan,  agreed  to  several  schemes  to  circumvent

compliance with the 85/15 Rule. For example, GA and YC (through Stonecipher and Morgan) agreed to implement Stonecipher's employee enrollment plan. Dkt 82 ¶213, 236. GA and YC agreed on the scholarship program that they used to increase non-veteran enrollment. Dkt 82, ¶¶242. GA and YC (through Stonecipher and Morgan) also jointly developed the combined AVT program. Dkt 82 ¶263-267. Both intended to circumvent the 85/15 Rule and both took actions toward doing so. GA, Stonecipher and Morgan do not escape liability just because they caused other YC agents do the "dirty work" of signing false certifications of their compliance and submitting the false and fraudulent claims.

Moving Defendants ignore the plain allegations of conspiracy on schemes to falsely represent compliance in submitted claims. They do not dispute the sufficiency of the agreements on employee enrollment, scholarship awards, the AVT program or the general non-compliance with 85/15 Rule. Instead Moving Defendants suggest only that they had nothing to do with the scheme to count JTED students as non-supported and therefore cannot be held liable as co-conspirators. (Apparently Defendants concede that if there is any other violation of the FCA on Count I or II then they are liable as co-conspirators). But GA and YC were still partners when YC put the JTED program in place. Accordingly, they are jointly and severally liable for their joint venture's actions.

GA had everything to do with the JTED progam. First, Defendants stopped following GA's feigned policy to enroll GA employees as "non-supported" students in Fall 2013 (Dkt 82, ¶228) – as soon as the JTED program started (Dkt 82 ¶279). Because they discontinued the old, employee enrollment scheme, it can reasonably be inferred that Moving Defendants agreed to the new JTED enrollment scheme. Moreover, after the implementation of the JTED scheme, Stonecipher still had GA submit invoices for YC to submit claims to VA despite its failure to meet the 85/15 Rule in the flight school. Dkt 82, ¶¶182-184. That was an act in furtherance of the JTED enrollment scheme. Moreover, because the basic theory of fraud hinges on GA's own failure to meet the 85/15 Rule requirements, its ongoing (and more egregious non-compliance) following the implementation of the JTED enrollment scheme is sufficient to make the whole program liable for FCA violations.

23

**IV.   COUNT VII – INTERFERENCE WITH CONTRACTUAL RELATIONS**

Stonecipher and GA retaliated against Relator and pressured YC to fire him (which YC did). Dkt 82, ¶¶336-343.  After the Court granted leave to amend this claim to comply with a heightened pleading standard, Relator added the detail of just how Stonecipher threatened to and then did interfere with Relator's employment.[9]  Specifically Stonecipher and GA hired a lawyer to write a disparaging and defamatory letter effectively demanding that Relator be terminated.  Dkt 82, ¶341(d).  The intent to interfere can fairly be inferred from Stonecipher's own statement that he intended to jeopardize Relator's employment. Dkt 82, ¶340(d).  The impropriety of the means is shown in allegedly false statements regarding Relator's qualifications and the feigned risks of having Relator remain employed.  Dkt 82, ¶341.  The proximity of time between Stonecipher's threat, his attack letter and Relator's termination support a plausible inference that the interference caused the termination.

Alternatively (or additionally), because GA and YC were partners in the Helicopter Program which Relator administered, GA was in what courts call an "employer-type relationship" with Relator making his termination actionable against GA (as well as YC) under Count V – Violation of 31 U.S.C. § 3730(h) – FCA Retaliation.  See, *Wichansky v. Zowine*, 2014 WL 289924 (D. Ariz. 2014)(finding that the 2009 FERA amendments to the FCA intended to broaden the scope of persons protected against retaliation to cover anyone in an "employer-type relationship").

**V.   STONECIPHER'S PERSONAL LIABILITY**

The FCA holds liable any "person" who causes others to use false statements or submit false or fraudulent claims. 31 U.S.C. § 3729.  Stonecipher apparently concedes he

---

[9]Relator understands the Court previously held this claim must meet the heightened pleading standard of Rule 9(b).  Relator's TAC has met that heightened standard.  But holding employment retaliation claims to a heightened pleading standard is not consistent with FCA decisions.  See, e.g. *Pencheng Si v. Laogai Research Found.*, – F.Supp – 2014 WL 5446487 (D.D.C., 2014) ("unlike the FCA fraud allegations in Counts I through IV, allegations regarding retaliation in violation of the FCA are unconstrained by the fraud pleading standard and need satisfy only Rule 8's general pleading requirements.").  The 9th Circuit is in accord.  *Lee*, 245 F. 3d at 1054.  In *Lee*, the 9th Circuit remanded a case to allow a relator to amend both his fraud claims and his retaliation claim.  The Court noted that the amended fraud claim would have to meet the 9(b) pleading standard, but did not impose the 9(b) requirement on the relator's retaliation claim.  *Id.*

24

is a "person" under the FCA and that the TAC sufficiently alleges his active role in the schemes to defraud the government.  (Indeed Stonecipher cites to no less than 25 separate allegations of his actions).  Instead, Stonecipher argues only that his fraudulent conduct is protected by the corporate shield.  Not surprisingly Stonecipher cites no authority to support this rather bizarre theory.  The controlling authority is to the contrary:

> An agent who fraudulently makes representations, uses duress, or knowingly assists in the commission of tortious fraud or duress by his principal or by others is subject to liability in tort to the injured person although the fraud or duress occurs in a transaction on behalf of the principal.  Restatement (Second) of Agency § 348

*Bechtel v. Liberty Nat. Bank*, 534 F. 2d 1335 fn. 6 (9th Cir. 1976); *US ex rel. Haskins v. Omega Inst., Inc.*, 11 F. Supp. 2d 555, 564 (D. N.J. 1998)(applying *Bechtel* analysis to FCA) ("It is axiomatic at a basic, common-sense level, therefore, that a wrong-doer cannot receive a free pass on liability for intentional misconduct simply by claiming to be immunized by the corporate shield.").  Because the FCA holds individuals responsible for their conduct, there is no corporate shield protecting Stonecipher from liability.

## VI.    ALSOBROOK'S LIABILITY (COMMUNITY LIABILITY)

Alsobrook's liability arises solely from her marital community with Stonecipher.

## VII.    CONCLUSION

Viewed in the light most favorable to Relator, the TAC contains sufficient allegations of underlying facts to give fair notice and to enable Defendants to defend themselves effectively.  *Starr v. Baca*, *supra* at 1216.

SUBMITTED this January 9, 2015.

HARRIS & ASSOC. P.C.
By:    /s/ Richard Harris
Richard J. Harris
Attorneys for Plaintiff-Relator

25

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on January 9, 2015, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

3

4

| Krista Carman | Georgia A Staton | Don Peder Johnsen | Joshua Grabel |
|---|---|---|---|
| | Elizabeth Gilbert | Jodi R. Bohr | Dan W. Goldfine |
| Lon R. Leavitt | Steven D. Leach | | James M. Gottry |
| Todd Lang | | | |

5

6

7

s/ Richard J. Harris

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26