**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| Daniel Hamilton, | No. CV-12-08193-PCT-GMS |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Yavapai Community College District, et al., | |
| Defendants. | |

Pending before the Court are: (1) Plaintiff Daniel Hamilton's Motion for Partial Summary Judgment as to Counts I & II and the Counterclaims, (Doc. 457); (2) Defendants Yavapai Community College District ("Yavapai"), John Morgan, and April Morgan's Joint Motion for Summary Judgment, (Doc. 476), and (3) Defendants Guidance Academy, LLC, ("Guidance"), John Stonecipher ("Stonecipher"), and Amanda Alsobrook's Motion for Summary Judgment, (Doc. 477). Also pending is Defendant Yavapai's Cross Motion for Summary Judgment, (Doc. 489) and various supplemental filings regarding the above motions. For the following reasons, Plaintiff Daniel Hamilton's Motion for Partial Summary Judgment is denied. Defendants Motions for Summary Judgment are granted in part and denied in part.

## BACKGROUND

The facts of this case are familiar to all of the parties. Plaintiff-Relator Daniel Hamilton ("Hamilton") alleges that the Defendants engaged in a number of fraudulent schemes to obtain funding from the United States Department of Veterans Affairs ("VA"). (Doc. 82.) Defendant Stonecipher is the managing member of Guidance, and

1    Defendant Morgan was the Dean of Career and Technical Education Campus for
2    Defendant Yavapai.  Defendant Guidance and Defendant Yavapai's enterprise was
3    governed by a "Memorandum of Understanding" ("MOU").  Under the MOU, Guidance
4    agreed to offer helicopter training to students enrolled at Yavapai beginning in 2011.
5    (Doc. 454 at 2; Doc. 497 at 64–65.)  In return, Yavapai was responsible for submitting
6    certifications to the VA to obtain funding for veteran students enrolled in the helicopter
7    training. (Doc. 454 at 2; Doc. 497 at 65.)

8        Several of Hamilton's claims were dismissed in Judge Rosenblatt's prior Order.
9    (Doc. 127.)   Judge Rosenblatt's Order differentiated between those claims that were
10   preserved and those that were dismissed.  The Court dismissed:

11
12       [A]ll claims arising prior to Summer 2011 term related to the failure to
         comply with the 85/15 Rule, all claims related to the GA Employee
13       Enrollment Plan, all claims related to the GA scholarship Program and the
         Expanded Scholarship Program and all claims against YC and Morgan
14       related to the billing for flight hours not provided by GA.  The Court will
         deny dismissal of Count I as to claims related to the combined AVT Degree
15       Program and the JTED Program, and the claims against GA and
         Stonecipher for billing for flight hours that were not provided."
16

17   Doc. 127 at 25.  See also Doc. 127 at 42-43.

18       Hamilton's claims that are the subject of these motions essentially assert the
19   Defendants defrauded the VA by obtaining funding in violation of 38 C.F.R. § 21.4201,
20   otherwise known as Regulation 4201 or the 85/15 Rule, and by submitting claims for in-
21   flight training not actually provided.[1]  Hamilton also asserts various claims against the
22   Defendants for interfering with his flight training at North-Aire and subsequently
23   interfering with his ability to find new employment.  In turn, Defendant Guidance filed
24   counterclaims against Hamilton for defamation and intentional interference with

25
26       [1] Plaintiff asserts that, pursuant to Judge Rosenblatt's Order his post-2011 85/15
     claims that are independent of his claims related to the GA Employee Enrollment Plan,
     the GA Scholarship Program and or the Expanded Scholarship Program were not
27   dismissed.  See. Doc. 615 at 8.  To the extent that such claims are pleaded and have been
     preserved, they were not dismissed by Judge Rosenblatt's previous order and are not the
28   subject of Defendants motions for summary judgment here.  They thus shall not be
     further addressed in this Order.

contractual relations.

**DISCUSSION**

**I.    Legal Standard**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   When the parties  file cross-motions for summary judgment, the Court "evaluate[s] each motion independently, 'giving the nonmoving party in each instance the benefit of all reasonable inferences.'" *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2015) (quoting *ACLU v. City of Las Vegas,* 333 F.3d 1092, 1097 (9th Cir. 2003)).   Substantive law determines which facts are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248).   Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"   *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

Although "[t]he evidence of [the non-moving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor," the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts.   *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or other materials;

or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). "A trial court can only consider admissible evidence in ruling on a motion for summary judgment," and evidence must be authenticated before it can be considered. *Orr v. Bank of Am.*, 285 F.3d 764, 773–74 (9th Cir. 2002).

## II. Analysis

### A. The False Claim Act

Most of the claims in this case arise under the False Claims Act, ("FCA"). The FCA imposes civil liability on "any person who . . . knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729. The FCA also imposes liability on those who conspire to violate the FCA. 31 U.S.C. § 3729(a)(1)(c). Conspiracy exists under the FCA where Defendants "had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672–73 (2008). The FCA also protects employees, such as Hamilton, from facing retaliation from their employers when they engage in protected activities, such as whistleblowing. 31 U.S.C. § 3730(h). Section 3730(b) of the FCA empowers individuals, such as Hamilton, to act as whistleblowers and "file suit on behalf of the United States seeking damages from persons who file false claims for government funds."[2] *Hooper v. Lockheed Martin Corp.,* 688 F.3d 1037, 1041 (9th Cir. 2012).

---

[2] The FCA bars certain actions from proceeding under the statute, most notably when actions are brought following public disclosure by a news source. 31 U.S.C. § 3730(e). This defense is referred to as the public disclosure bar. The public disclosure bar, does not apply here, however, because the government objects to its application. (Doc. 487). The FCA explicitly notes that the public disclosure bar does not apply where the government objects to its implementation. *See* 31 U.S.C. § 3730(e)(4)(A) ("The court shall dismiss an action or claim under this section, *unless opposed by the Government*, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed." (emphasis added)); *see also United States ex rel. Hagerty v. Cyberonics, Inc.*, 95 F. Supp. 3d 240, 256 (D. Mass. 2015), *aff'd sub nom. Hagerty ex rel. United States v. Cyberonics, Inc.*, 844 F.3d 26 (1st Cir. 2016) ("The new public-disclosure bar appears to be non-jurisdictional because it confers on the government the power to prevent the dismissal of an FCA claim that would otherwise fall within the public-disclosure bar.").

A defendant must act knowingly to be liable under the FCA. The FCA specifies that a person acts "knowingly" with respect to information if the person:

> **(A)(i)** has actual knowledge of the information;
>
> **(ii)** acts in deliberate ignorance of the truth or falsity of the information; or
>
> **(iii)** acts in reckless disregard of the truth or falsity of the information; and
>
> **(B)** require no proof of specific intent to defraud;

31 U.S.C. § 3729.

Evidence that a defendant may have obtained funding to which it was not entitled is not sufficient to illustrate that he acted knowingly, as "proof of mistakes is not evidence that one is a cheat, and . . . common failings . . . are not culpable under the Act." *Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996) (internal citations and quotations omitted). However, evidence that a defendant engaged in "ostrich type" behavior "where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted" suggests that a defendant acted with reckless disregard. *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008). The Ninth Circuit has further held that those who seek government funds have a "duty to familiarize themselves with the legal requirements for payment." Therefore, reckless disregard may be present where a defendant fails to familiarize himself with the legal requirements for government compensation. *See United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001). This is particularly so when a defendant relies heavily on government funding for much of his business. *See id.* ("By failing to inform himself of those requirements, particularly when twenty percent of Asher Clinic's patients were Medicare beneficiaries, he acted in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question."). Therefore, while mere negligence may be insufficient to establish reckless disregard, evidence suggesting that a

defendant failed to take reasonable steps to ascertain and comply with regulatory requirements is a sufficient question of material fact for Plaintiff to defeat Defendants' summary judgment motions. *See id.*, (upholding a district court's finding that a defendant acted knowingly where the defendant failed to educate himself on the relevant regulatory framework).

However, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016). This is a "demanding" standard; "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment," "[n]or is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.* at 2003. Further, materiality "cannot be found where noncompliance is minor or insubstantial." *Id.* Proof that the government paid a claim, "despite its actual knowledge that certain requirements were violated," is "very strong" evidence that the violation was not material. *Id.* at 2003-04. Conversely, evidence that the government "consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" is evidence of materiality. *Id.* at 2003.

Hamilton argues that the Defendants submitted false claims in two general ways: First, by violating a significant requirement for VA funding known as the 85/15 Rule; second, by submitting false claims for air time instruction that was not provided.

## 1. The 85/15 Rule

Regulation 4201 states that the "Department of Veterans Affairs shall not approve an enrollment in any course for an eligible veteran, not already enrolled, for any period during which more than 85 percent of the students enrolled in the course are having all or part of their tuition, fees or other charges paid for them by the educational institution or

by the VA." 38 C.F.R. § 21.4201. "An 85–15 percent ratio must be computed for each course of study or curriculum leading to a separately approved educational or vocational objective." 38 C.F.R. § 21.4201(e).

Regulation 4201 also outlines the requirements for determining which students may be considered "nonsupported." In relevant part, students are considered nonsupported if they are: (1) not veterans or reservists, and "are not in receipt of institutional aid," or (2) are "undergrads and non-college degree students receiving any assistance provided by an institution, if the institutional policy for determining the recipients of such aid is equal with respect to veterans and nonveterans alike." 38 C.F.R. § 21.4201(e)(2). If the student falls outside the definition of nonsupported, then she must be considered "supported" by the institution.

### a.     The AVT Program

Yavapai began plans to sunset its separate aviation degree programs and institute a combined AVT program in late 2012. It submitted a course catalogue to the VA with an explanation of the new program in December of 2012. (Doc. 449 at 14; Doc. 497 at 28.) The combined AVT program featured four distinct concentrations, yet Yavapai calculated a single 85/15 ratio for the entire combined program rather than calculating a separate ratio for each of its concentrations. (Doc. 449 at 14; Doc. 497 at 28-29.). Yavapai began offering the combined AVT program to new students in fall of 2013. (Doc. 449 at 14.) The VA suspended the combined AVT program in spring of 2015, and ultimately determined that Yavapai needed to submitted separate 85/15 calculations for each concentration within the combined AVT program. (Doc. 494 at 20; Doc. 497 at 46-47.)

Regardless of what Relators may have indicated to the VA or its representatives,[3] Defendants sufficiently informed the VA that they were calculating the 85/15 ratio based on the entire AVT enrollment prior to and during the program's implementation [4]

---

[3] The resolution of these motions was substantially delayed while the Court determined whether the merits of any of them were sufficiently affected by the government's release to the Defendants of communications between the Relator and the

Ms. Swafford was aware from the Fall of 2013 up through March of 2015 that YC was calculating its compliance with the 85/15 Rule using the entire enrollment in the combined AVT programs, and she believed that it was appropriate to do so. Doc. 449-2, at lines 167:24-174:9, 200:2-201:14, 208:15-209:12, 395-12-19, 399:12-400:14. Another nearby aeronautical university, Embry-Riddle, had similarly calculated its compliance with the 85/15 ratio for some time prior to the Fall of 2013. Doc. 449-2 at 395:2-396: 11. And had Ms. Swafford been asked during this time period by YC or any of the Arizona institutions for which she was the VA's ELR she would have told them that it was appropriate, in calculating the 85/15 ratio to count all students in combined programs. Doc. 449-2 at 46 pp. 398-401.

Moreover, Ms. Swafford accepted YC's Statements of Assurance in the Spring of 2014. When she did so Ms. Swafford thought that it was reasonable for YC to rely on

_____

VA's counsel and the Office of Inspector General. This release occurred after discovery had closed. While the Court has reviewed the documents cited by both parties, which do demonstrate communications between the Relator and various persons representing or involved with the VA beginning as early as 2012 regarding Plaintiff's allegations, it cannot conclude that the documents alone without further elucidation are sufficient to establish or prevent the establishment of any material issue of fact as to the pending issues. It does not, therefore, further address those documents.

[4] While YC took sufficient steps to inform the VA that they were calculating the 85/15 ration based on the entire AVT program enrollment, there are competing issues of material fact as to whether the VA explicitly authorized YC to do so Ms. Aldrich, Yavapai's School Certifying Official, sent Ms. Swafford, the VA's Education Liaison Representative ("ELR") assigned to YC, an email containing the combined AVT program's course catalogue in December of 2012. (Doc. 449 at 14.) Ms. Aldrich testified that soon thereafter, she personally discussed Yavapai's method of calculating the 85/15 Rule with Ms. Swafford. (*Id.*) Ms. Aldrich testified that Ms. Swafford told her that it was proper for Yavapai to compute one 85/15 ratio for the entirety of its degree program, and that the 85/15 Rule did not require separate calculations for each concentration within the program. (*Id.*) However, Ms. Swafford testified that she does not recall having any such conversation with Ms. Aldrich in December of 2012. (Doc. 497 28–29, Ex. B at 165.) Furthermore, Ms. Swafford testified that Yavapai never explicitly asked whether it could comply with the 85/15 Rule if it combined the four concentrations of the AVT program into a single ratio. (Doc. 497 at 90, Doc. 498, Ex. B at 362.)

that acceptance in its continued use of the entire combined enrollment in calculating compliance with the 85/15 Rule.

It is also undisputed that the VA through Education Compliance Survey Specialists (ECSS) reviewed the AVT program for compliance for the period from June 1, 2013, thought May 6 2014. Ms. Vigil also acknowledged that in the Fall of 2013 up through early 2015 she believed that schools were allowed to count all of the students in a combined AVT program whether they were enrolled in a flight or non-flight option. Doc. 449-3 pp. 126:13-127:15, 129-31. And she was aware that YC counted all persons in the combined AVT degree program in calculating the Defendants compliance with the 85/15 Rule. Ms. Vigil knew that Embry-Riddle had a similar combined program and calculated its compliance with the 85/15 Rule in this way. The VA informed YC that it was in compliance. In doing so, at least one of the ECSS's, Ms. Vigil, testified, as had Ms. Swafford, that based upon the findings of the compliance survey visit and the submission of the 85/15 calculations for fall of 2013 and Spring of 2014 it was reasonable for YC to believe that it was properly calculating and reporting its 85/15 compliance up to March 2015. Doc. 449-3 at 181-82.

Hamilton asserts that the Defendants knowingly violated the FCA through the creation and implementation of the combined AVT program. His claims include allegations for direct liability under the FCA as well as conspiracy to violate the FCA. In their briefings, the Defendants do not argue that calculating the 85/15 ratio for the entire AVT program is proper under the 85/15 Rule; rather, the Defendants argue that Hamilton cannot demonstrate that the Defendants knowingly or materially violated the 85/15 Rule.

### i.    State of Mind

Three principle Ninth Circuit cases outline the requirements for scienter in a False Claims Act Case, when it is disputed that the regulations implementing the program are unclear. In the first, *United States v. Mackby,* 261 F.3d 821 (9th Cir. 2001), the Ninth Circuit delineated the obligations of a reimbursed Medicaid provider to be familiar with

Medicaid regulations and what constitutes reckless disregard or deliberate indifference as to those regulations sufficient to incur liability under the FCA.

In *Mackby,* the owner and managing director of Asher Physical Therapy Clinic directed the clinic's office manager to submit the clinic's Medicaid claims using the Medicaid provider identification number (PIN) that belonged to his physician father. By using his physician father's PIN, the clinic owner falsely certified that the services were provided under his father's supervision.

The owner had received Medicare fiscal intermediary bulletins which directed that the claim form was to be filled in with the assigned PIN for the performing physician or supplier. Thus, the Ninth Circuit affirmed the District Court's determination that the claim submission was false because, even though the described physical therapy services had in fact been provided, and reimbursement for those services could have been otherwise sought, the services had not been provided under the supervision of the clinic owner's father.

About twenty percent of the Asher Clinics' patient base was Medicare patients. Under such circumstances the Circuit held "'Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law….' Participants in the Medicare program have a duty to familiarize themselves with the legal requirements for payment." (quoting and citing from *Heckler v. Cmty. Health Servs. Of Crawford County, Inc.,* 467 U.S. 51, 63-64 104 S.Ct. 2218, L.Ed.2d 42 (1984). The Court found with respect to the owner that:

> It was his obligation to be familiar with the legal requirements for obtaining reimbursement from Medicare for physical therapy services, and to ensure that the clinic was run in accordance with all laws. His claim that the did not know of the Medicare requirements does not shield him from liability. By failing to inform himself of those requirements particularly when twenty percent of Asher Clinic's patients were Medicare beneficiaries, he acted in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question.

Id. at 828 citing *United States v. Krizek,* 111 F.3d 934, 942 (D.C. Cir. 1997).

Thus, even though the Owner instructed the office manager to contact Medicare in 1988 to find out about the appropriate payment rules, and even though several years later she inquired about changing Asher's billing number to that of a physical therapist who worked at the clinic and this request was denied by Medicare's fiscal intermediary, it did not negate the requirement that the owner was required to operate the clinic in a legal manner and thus did not excuse the false claims submitted over an eight year period.

In *United States v. Bourseau,* 531 F.3d 1159 (9th Cir. 2008), two operators of psychiatric hospitals submitted false cost reports to their Medicare intermediary for use in calculating the appropriate adjustments to be made to the hospitals for their services to Medicare beneficiaries. Although some of the false costs could have been appropriately included in the cost reports as disputed items had they been appropriately identified as such, they were not so identified in the defendants' submissions. Thus, despite the defendant's assertions that the false costs were submitted in a good faith interpretation of Medicare regulations, the Ninth Circuit upheld the District Court's determinations that the false claims were made with sufficient disregard to meet the scienter requirement for a false claim. "Considering the regulations described above and the degree to which Bourseau's actions deviated from them, Bourseau did not rely on good faith interpretations of the regulations in including the disputed costs in the reports." The Court again reinforced the affirmative obligation of a recipient of federal funds to make inquiries regarding areas of regulatory uncertainty.

> In defining knowingly, Congress attempted 'to reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted.' S.Rep. No. 99-345, at 21 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5286. Congress adopted 'the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.' *Id. at 20; see also id.* at 7 (discussing the importance of individual responsibility because the government has limited resources to police fraud). 'While the Committee intends that at least some inquiry be

made, the inquiry need only be 'reasonable and prudent under the circumstances.' *Id.* at 21.

*Bourseau,* 531 F.3d at 1168.

Yet, *United States ex rel. Oliver v. Parsons Co.,* 195 F.3d 457, 460 (9th Cir. 1999), underlines what *Bourseau* also indicates, that when a recipient of federal funds relies on a good faith interpretation of a regulation it is "not subject to liability" for violating the false claims act  This release from responsibility is "not because his or her interpretation was correct, or 'reasonable' but because the good faith nature of his or her action forecloses the possibility that the scienter requirement is met." *Id.*

In this case, as in *Mackby* and *Bourseau*  Defendants submitted a false claim to the VA – that is Defendants certified compliance with the 85/15 ratio based on the entire enrollment in the AVT program.  Defendants make no present argument that it was appropriate to do so.

Also, in this case, as in *Mackby* and *Bourseau* the VA reimbursed education made up a significant portion of the compensation received by Defendants for their helicopter flight programs.  Thus, as dictated by both *Bourseau* and *Mackby,* Defendants were under some obligation to make at least limited inquiries to be familiar with and/or familiarize themselves with the legal requirements, including the 85/15 ratio, for obtaining reimbursement from the VA for their helicopter flight training.

Despite these important similarities to *Mackby* and *Bourseau,* in this case, as it pertains to their counting of all the students in the combined AVT program, Defendants did nothing more than what the relevant VA representatives and others in the community believed to be approved practice under the relevant text of the 85/15 regulations.

It is not disputed that the VA's ELR for Arizona, Ms. Swafford, and its ECSS who was one of the two ECSS's that conducted the compliance reviews for YC, Ms. Vigil, thought during this period that it was appropriate for an institution to count all the students in a combined aviation degree program towards compliance with the 85/15 ratio whether or not they were enrolled in a flight option.  It is uncontested that Embry Riddle

Aeronautical University located in Prescott had a similar combined aviation degree program of which Defendants were aware, and had similarly calculated its compliance with the 85/15 requirement without objection for some time.

Nor, at least as it relates to counting all of the students in the combined degree program, did Defendants fail to disclose any relevant facts to the VA. YC sufficiently disclosed to the VA that it was counting all such students in its new degree program.

When Ms. Swafford accepted YC's Statements of Assurance in the Spring of 2014, she thought that it was reasonable for YC to rely on that acceptance in its continued use of the entire combined enrollment in calculating compliance with the 85/15 Rule.

It is also undisputed that when the VA's ECSSs reviewed the AVT program for compliance for the period from June 1, 2013, thought May 6 2014, the VA informed YC that it was in compliance. In doing so, the VA was aware that YC was counting all of the students in its combined AVT program for its calculation of compliance with the 85/15 Rule. Ms. Vigil testified, as had Ms. Swafford, that based upon the findings of the compliance survey visit and the submission of the 85/15 calculations for fall of 2013 and Spring of 2014 it was reasonable for YC to believe that it was properly calculating and reporting its 85/15 compliance up to March 2015. Doc. 449-3 at 181-82.

It was not until the Spring of 2015 when the Los Angeles Times published its article – which may have been in significant part generated by Plaintiff or at least his lawsuit – that the VA itself took the position that each concentration of the AVT program had to be in compliance with the 85/15 Rule. While the LA Times Article may have been beneficial to the public in causing the VA to more clearly review the regulation and appropriately enforce its standards, the fact that YC's certification was in fact false is insufficient in and of itself for scienter to be established when the VA itself believed it was appropriate to follow the practice during the relevant period, and allowed others to do so.

In light of the VAs implemented understanding throughout this period, the plain text of the rule itself, which did not change from 2013 through 2015, is insufficient

evidence of scienter. Summary Judgment is therefore denied to the Plaintiff and granted in the favor of the Defendants on Plaintiff's claims that assert that Defendants filed a false claim anytime between Fall 2013 and March 2015 by counting all students in their combined AVT program.[5]

### b.   The JTED Program

In the summer of 2012, Yavapai also began to develop a new program with the Mountain Institute Joint Technical Education District in which high school students could enter the combined AVT program.   (Doc. 449 at 16; Doc. 497 at 34.)   This program became known as the "JTED" program.   (*Id.*)   The JTED program began in fall of 2013. Yavapai calculated its JTED students as part of the "unsupported" students necessary to meet the 85/15 Rule. The JTED students had certain restrictions on the classes they were permitted to take due to their status as JTED students, and their education was funded by JTED itself.  (Doc. 497 at 97, 102.)   JTED, however, did not pay the normal tuition cost per credit hour for the courses in which its students were enrolled.

In their briefings, Defendants do not argue that they were legally correct in counting students from the JTED program as nonsupported in calculating their 85/15 ratios.   As above, they argue that there is no issue of fact that they did not have the required mental state to be liable under the statute.   They further argue that given the undisputed facts any failure on their part to comply with the 85/15 Rule is not material. As it pertains to the counting of JTED students, however, there are relevant issues of material fact.

### (i)   State of Mind

Issues of material fact preclude summary judgment as to whether the Defendants knowingly miscalculated the 85/15 ration by counting JTED students.   The JTED program actually began in fall of 2013, and in that same semester, Yavapai's Director of

---

[5] To the extent the government paid the Defendants claims "despite its actual knowledge that certain requirements were violated," that would still be a basis for granting the Defendant's motions for summary judgment concerning the combined AVT program on materiality grounds. *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002, 2003-04 (2016).

Financial Aid, Terri Eckel, wrote to Ms. Swafford to inform her of the new program and that the JTED students would be included as "unsupported" for the purposes of calculating the 85/15 ratio for Regulation 4201. (Doc. 449 at 17, Ex. 10 at 4, Ex. 2 at 46.) Ms. Eckel asked for guidance from Ms. Swafford at that time, but she did not get a response from the VA for two months. (Doc. 449 at 17.) Ms. Swafford eventually did respond to Ms. Eckel, and informed her that counting JTED students as nonsupported was proper under the 85/15 Rule. (Doc. 449 at 17.) However, Ms. Swafford qualified her response by stating that her interpretation of the regulation was "just her opinion." (Doc. 494, Ex. 2 at Ex. 14.) Ms. Swafford also indicated that she would pass Ms. Eckel's inquiry along to her superiors, and inform Ms. Eckel of their response. (*Id.*) There is no evidence that Ms. Swafford ever followed up with Ms. Eckel.

If Ms. Swafford was sufficiently informed by the Defendants of all of the facts pertaining to the tuition payments made on behalf of JTED students, Defendants' inquiry to Ms. Swafford, coupled with her expressed and unretracted opinion, would have been sufficient under *Mackby* and *Bourseau* to defeat scienter. Nevertheless, there are issues of fact as to whether Defendants withheld pertinent information from Ms. Swafford in obtaining her opinion. In such an instance they cannot rely on Ms. Swafford's opinion to defeat scienter. *See, e.g., Parsons,* 195 F.3d at 465 (holding that the failure to make appropriate disclosures prevents the grant of summary judgment on the question of scienter).

The MOU between YC and JTED allowed JTED, in lieu of paying full tuition for its students, to pay amounts towards YC's instructor's salaries—an amount which Plaintiff claims to be significantly less than the normal tuition per credit hour per student. This form of reduced payment, Plaintiff asserts, subsidizes JTED students and disqualifies them from being "nonsupported" under the Code of Federal Regulations Pursuant to those regulations, JTED Students are "supported" by YC if they have "all or part of their tuition fees or other charges paid for them by the educational institution or by VA." 38 C.F.R. § 21.4201(a). To the extent that the arrangement between JTED and YC

might have allowed JTED to pay less for its students' enrollment than standard tuition and thus allow JTED students to be supported by YC due to subsidized tuition, it is something that would have had to have been communicated to Ms. Swafford for Defendants to be able to rely on her advice to effectively demonstrate that they lacked scienter in submitting their false claims.

The Defendants point to testimony that (1) the VA had copies of the MOU between JTED and YC, and further, (2) VA had access to the student ledgers which they consulted during compliance surveys and could have, should have, and possibly did use to determine in their compliance surveys the exact amount of the financial payments made on behalf of JTED students. But, unlike the situation with respect to counting all of the students in the joint degree program, there was no VA pre-existing and accepted practice pertaining to counting JTED students as unsupported students in calculating the 85/15 ratio. Nor is it clear that any of the government reviewers actually reviewed the student ledgers to determine whether JTED students were in fact paying full tuition.

The Defendants fully identified and disclosed all of the pertinent facts pertaining to their count of all of the student enrolled in the combined AVT program. Unlike that disclosure there is no evidence that they highlighted to the VA that they were counting JTED students as unsupported even when JTED students were paying something other than a regular tuition payment. In submitting claims to the VA without fully disclosing this information they would not have fulfilled their obligation under *Mackby* and *Bourseau.* Significant recipients of federal funds cannot merely submit questionable claims to the government that turn out to be false and then assert that they were entitled to do so if those claims were undiscovered by the government. This is so even if the government should have discovered the falseness of the claims.

There is also evidence that some of Yavapai's employees doubted that the students in the JTED program could properly be considered "nonsupported" under the 85/15 Rule. Ms. Aldrich refused to sign certifications to the VA regarding the program because she did not feel knowledgeable enough about the program to certify its compliance. (Doc.

497 at 99.)   Minutes from a meeting between Yavapai, Morgan, and Guidance representatives indicate that as of July of 2012, at least one Yavapai employee did not believe the JTED students could be consider unsupported under the 85/15 Rule.  (Doc. 497 at 105; Doc. 498, Ex. Q.)   A reasonable trier of fact could determine that these facts indicate that the Defendants failed to uphold their "duty to familiarize themselves with the legal requirements for payment." *Mackby*, 261 F.3d at 828.  Or, if they did so, they intentionally failed to adequately disclose necessary facts to the VA to rely on its authorization to count JTED students as unsupported.    Because there are issues of fact as to whether all of the relevant facts were disclosed to Ms. Swafford summary judgment is denied.

### (ii)   Materiality

There remain issues of as to whether the alleged violations of the 85/15 Rule were material.  At the very least, Defendants allege, that the VA was aware through program audits and otherwise of the basis for their 85/15 calculations and at least tacitly accepted that basis.  It is undisputed for instance  that  the VA conducted compliance visits to Yavapai during the relevant time frame.  (Doc. 449 at 19.)  While the Defendants are free to argue the meaning of this evidence at trial the factual record pertaining to compliance visits is insufficient to establish that the VA was willing to continue to pay the Defendants' claims even in light of its awareness of the Defendants' acceptance of something less than full tuition for JTED students.

Further,  Yavapai's program was suspended in 2011 for failing to comply with the 85/15 Rule.  (Doc. 449 at 9–10.)  This suggests  that the government "consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement," and thus indicates materiality. *Universal Health Servs., Inc.*, 136 S. Ct. at 2002.  At this stage of the proceedings, the Court cannot weigh the evidence of the parties.   And even if Yavapai could present "strong evidence" that the government had actual knowledge of the basis of its calculation of the 85/15 ratio, "strong evidence" does not preclude issues of fact which do

exist here.  Therefore, both motions for summary judgment are denied as to the summer of 2014 claims.

### c. The Guidance Defendants

The VA's regulations state that the "contracted portion of a flight course must meet all the requirements of [Regulation 4201] for each subcontractor."  38 C.F.R. § 21.4263(l).  Furthermore, in the Ninth Circuit, one "need not be the one who actually submitted the claim forms in order to be liable" under the FCA.  *United States v. Mackby*, 261 F.3d 821, 827 (9th Cir. 2001).  "The FCA reaches 'any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government.'"  *Id.* (quoting *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 544–45 (1943)).  Therefore, the Guidance Defendants' motion for summary judgment turns on whether Hamilton can present facts that suggest Guidance assisted Yavapai in defrauding the government through the combined AVT program and the JTED program.

In 2011, Guidance entered into a "Memorandum of Understanding" ("MOU") with Yavapai to provide helicopter training to students enrolled in Yavapai's professional pilot program.  (Doc. 454 at 1.) The MOU was periodically updated, most notably in 2013.  The Guidance Defendants admit that they were aware of Yavapai's method of calculating the 85/15 Rule for the combined AVT program.  (*Id.*)  However, it asserts that it believed that Yavapai had permission to utilize its method for calculating the ratio from the VA.  (*Id.*)

Nevertheless, the MOU entrusted marketing the programs to both parties.  (*Id.* at 111.)  Meeting minutes from Guidance's management reflect that the Guidance Defendants needed the JTED program to work to resolve "our 85/15 issues."  (Doc. 497 at 108.)  Of course, Guidance benefited substantially from the VA's certification of the program and payment to Yavapai for the programs that Guidance provided to Yavapai students and for which Guidance was paid by Yavapai.  The MOU also reflected that

both Guidance and Yavapai agreed to comply with the 85/15 Rule.[6]  (Doc. 506 at 48.)

Hamilton has raised sufficient evidence for a reasonable jury to conclude that the

Guidance Defendants did assist Yavapai in developing the combined AVT and JTED

programs with Yavapai.

There is also sufficient evidence to find that Guidance acted with at least reckless

disregard by failing to remain informed regarding the 85/15 Rule.  *See Mackby*, 261 F.3d

at 828 (finding that a doctor acted with reckless disregard by failing to familiarize himself

with Medicare requirements when twenty percent of his patients were Medicare

beneficiaries).  Guidance asserts that it knew of another institution operating in the same

manner as the combined AVT program, but to the extent that assertion pertains to Embry

Riddle University's counting of all students in its combined degree programs, Plaintiff's

claims in that respect have been dismissed.

Guidance does not cite to a single authority where a defendant obtained summary

judgment on an FCA claim by asserting that knowledge of the relevant regulations was

someone else's responsibility.  To the contrary, recent case law clarifies that the FCA was

intended  "'to reach what has become known as the 'ostrich' type situation where an

individual has 'buried his head in the sand' and failed to make simple inquiries which

would alert him that false claims are being submitted.'"  *United States v. Bourseau*, 531

F.3d 1159, 1168 (9th Cir. 2008) (quoting S. Rep. No. 99–345, at 21 (1986)).  Guidance

admitted that it knew there were concerns regarding compliance with the 85/15 Rule.

(Doc. 454 at 4.)  Guidance attended meetings and engaged in discussions with Yavapai to

formulate a solution to the Defendants' 85/15 issues, yet the record does not reflect to

what extent, if any, Guidance took independent steps to inform itself of the VA's

regulations.  (Doc. 497 at 108.)  This failure to inquire suggests that Guidance may have

acted with reckless disregard, particularly given that Guidance received millions of

---

[6] Both parties make several arguments regarding whether Guidance and Yavapai were a joint venture under Arizona law.  The relevant inquiry to the Court, however, is whether Guidance assisted Yavapai in submitting or causing fraudulent claims to be submitted to the VA.

dollars of VA funding every term. (Doc. 497 at 114.); *Mackby*, 261 F.3d at 828 (emphasizing that businesses receiving considerable sums of money from the government should ensure that they are entitled to the money they receive). Therefore, Guidance's motion for summary judgment is denied.

### d. Conspiracy

Count Four asserts that the Defendants conspired to submit false claims to the government, specifically by conspiring to formulate ways around the 85/15 Rule. (Doc. 82 at 61–62.) To be liable for conspiracy under the FCA, the evidence must establish that the Defendants "had the purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672–73 (2008). In other words, the parties can only be liable for conspiracy if there is evidence that they "*agreed* that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Id.* at 673.

There are material issues of fact that preclude summary judgment. Hamilton has presented evidence that the Defendants were engaged in emails discussing "85/15 permanent fixes" in July of 2012. (Doc. 497 at 112.) There is also evidence suggesting that the Defendants knew there were concerns regarding the legality of the JTED program during that time period. (Doc. 497 at 97.) Finally, there is evidence that during a meeting attended by representatives of both Guidance and Yavapai, John Morgan claimed that the Defendants "are shackled by the VA" and the 85/15 Rule. (Doc. 497 at 112, Doc. 498-1 at 51.) In his deposition, John Morgan admitted that one of the purposes behind creating the JTED program was to increase veteran eligibility in the combined AVT program. (Doc. 497 at 98.) These facts indicate that a reasonable juror could determine that the Defendants created the JTED program and the combined AVT program with the "purpose of 'getting' the false record or statement to bring about the Government's payment of a false or fraudulent claim." *Allison Engine Co.*, 553 U.S. at 672–73. Thus, summary judgment as to the conspiracy claim is denied.

### 2. Flight Hours

Hamilton asserts that Guidance submitted false claims by invoicing Yavapai for flight hours not provided in two different ways. First, Hamilton alleges that Guidance did not provide students with the contracted amount of flight hours for their courses. Second, Hamilton alleges that students who had to repeat the course were limited to half the normal flight hours to which first time students were entitled, yet Guidance billed the VA for the same amount.

Both Hamilton and Guidance present flight records that they allege prove their respective points. Hamilton presented the handwritten, original flight records from the fall of 2011. (Doc. 497 at 80, Doc. 498-1 at 38–49.) These records indicate that some students did not receive the hours they were entitled to. Hamilton asserts that each student was entitled to a total of 74 hours. (*Id.*) However, Guidance submitted computer generated records that indicate that any veteran that missed flight time in a semester was given the opportunity to make it up in the following semester. (*See* Doc. 472-1.) Guidance further submits that students were only entitled to 69 hours, not 74. (*Id.*) It also appears that one of the students Hamilton listed in his complaint is not a veteran, and therefore his tuition was never paid by the VA. (Doc. 472-2 at 1.) These conflicting records raise a genuine issue of material fact that precludes summary judgment at this time.

Second, students who had to repeat the course were limited to half the normal flight hours to which first time students were entitled to because such students were allowed to count some of their former hours in obtaining their certifications. (Doc. 497 at 107; Doc. 454 at 8.) Defendants nevertheless billed the same amount for those students that it billed for others since Guidance billed a flat rate for all students who took the course. (Doc. 497 at 107; Doc. 454 at 8.) While Hamilton introduced evidence that the VA did not consider flat rate schools to be examples of "best practice" under the regulations, he did not show that Guidance violated the regulations through this practice. (Doc. 497 at 81, 107.) Therefore, there is no basis on which this Court could conclude

that Guidance's practice amounted to a fraud on the government as required by the FCA. Furthermore, the VA knew of Guidance's practice—the practice was official school policy, printed on course syllabi, and known to Ms. Vigil at the time of her testimony—and continued to pay the school despite it. (Doc. 454 at 8–9.) This continued funding is evidence that even if there was noncompliance with Regulation, it was immaterial. *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2003 (2016). Hamilton does not provide any evidence to the dispute any of this, and thus Guidance is entitled to summary judgment on this theory.

### 3. Retaliation Claims

Count Five asserts that Yavapai unlawfully retaliated against Hamilton for investigating and reporting the Defendants' violations of the FCA by terminating him. "An FCA retaliation claim requires proof of three elements: '1) the employee must have been engaging in conduct protected under the Act; 2) the employer must have known that the employee was engaging in such conduct; and 3) the employer must have discriminated against the employee because of her protected conduct.'" *Cafasso, United States ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1060 (9th Cir. 2011) (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996)).

A plaintiff's conduct is protected under the FCA as long as he is "investigating matters which are calculated, or reasonably could lead, to a viable FCA action." *Hooper*, 91 F.3d 1261. Hamilton avows that he was doing just that, specifically by identifying issues with Regulation 4201 compliance prior to his termination. (Doc. 497 at 114.) To the extent Yavapai asserts that it was unaware of this investigation, that fact is disputed, as Hamilton avows that he went to John Morgan with this information. (Doc. 497 at 114.)

Yavapai nevertheless argues that summary judgment is appropriate because even if Hamilton can present a prima facie case of retaliation, Yavapai can put forth legitimate, non-discriminatory reasons for firing him. In other words, Yavapai asserts that the *McDonnell Douglas* burden shifting analysis applies to Hamilton's retaliation claim.

The Ninth Circuit has not yet addressed whether the *McDonnell Douglas* burden shifting analysis applies to retaliation claims. However, many other courts, including some in the Ninth Circuit, have applied the burden shifting analysis to retaliation claims. *See Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir. 2012) ("The *McDonnell Douglas* approach fits comfortably with the test that courts generally apply to retaliation claims under section 3730(h)(1).");.*United States v. Health*, No. 13-CV-01924-SI, 2016 WL 3540954, at *12 (N.D. Cal. June 29, 2016) (collecting cases). The parties also evidently agree that the *McDonnell Douglas* analysis should apply. (Doc. 506 at 56; Doc. 476 at 17.) Therefore, the Court will apply the burden shifting analysis here.

The *McDonnell Douglas* framework first requires the plaintiff to establish a prima facie case of retaliation. As discussed above, Hamilton has done this. "Once this is accomplished, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action." *Harrington*, 668 F.3d at 31. Notably, "this imposes merely a burden of production, not one of proof." *Id.* If the employer does this, "the plaintiff must assume the further burden of showing that the proffered reason is a pretext calculated to mask retaliation." *Id.*

Yavapai submitted evidence that Hamilton was fired for non-retaliatory reasons, including insubordination, difficulties working with Guidance, repeated failures to perform his tasks, and general inability to meet expectations. (Doc. 449 at 22–23.) However, Hamilton submitted evidence these reasons are pretextual, including his supervisor's testimony that Yavapai often had difficulties working with Guidance generally, and Hamilton's performance review indicated that Guidance was creating a hostile work environment. (Doc. 497 at 115.) Therefore, the parties have presented evidence that creates a triable issue of fact as to whether Hamilton was dismissed in retaliation for engaging in protected activity under the FCA, and thus summary judgment is denied as to Count Five.

/ / /

### 4.     Damages

Hamilton's Partial Motion for Summary Judgment, (Doc. 457), is denied. Therefore, the Court need not address whether he may seek damages for payment received beyond the fall 2013 term at this time.

### B.     Intentional Interference with Contractual Relations Claims

The elements for an intentional interference with contractual relations claim are well established in Arizona:

> A prima facie case of intentional interference requires: (1) existence of a valid contractual relationship, (2) knowledge of the relationship on the part of the interferor, (3) intentional interference inducing or causing a breach, (4) resultant damage to the party whose relationship has been disrupted, and (5) that the defendant acted improperly.

*Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 201 Ariz. 474, 493, 38 P.3d 12, 31 (2002), *as corrected* (Apr. 9, 2002).

### 1.     Morgan and Yavapai

Hamilton asserts that Yavapai and Morgan intentionally interfered with his contractual relations with NorthAire Aviation by 1) interfering with his right to complete his flight training and 2) interfering with his employment relationship with NorthAire.[7] The first element of the intentional interference with contractual relations tort is the existence of a valid contractual relationship. This requires Hamilton to demonstrate that his expectancy in employment at NorthAire "constitute[d] more than a mere hope." *Dube v. Likins*, 216 Ariz. 406, 412–13, 167 P.3d 93, 99 (Ct. App. 2007) (internal citation omitted). Hamilton was never employed by NorthAire; indeed, he never filled out a formal application to work at NorthAire or any of Justin Scott's other businesses. Nonetheless, Hamilton asserts that he had a valid contractual relationship because he informally discussed his employment at NorthAire "in some capacity" with Justin Scott. (Doc. 497 at 62.) This is insufficient to establish a valid contractual relationship under

---

[7] Hamilton's claim against Morgan for interference with his employment at Yavapai was dismissed in an earlier order. (Doc. 414 at 11.)

Arizona law, as there is no evidence suggesting that Hamilton's expectation in employment at NorthAire amounted to more than a mere hope. Therefore, this claim is dismissed.

Hamilton's claim that Morgan and Yavapai intentionally interfered with his education at NorthAire survives summary judgment. Yavapai and Morgan essentially argue that the claim should be dismissed because Hamilton cannot prove that intentional interference caused his damages, as Hamilton was able to train for months at NorthAire following his termination, Scott testified that Morgan did not pressure him to bar Hamilton's continued training at NorthAire, and Hamilton himself asked Scott for a refund in lieu of receiving his flight training. (Doc. 449 at 26–27.) However, Yavapai's argument focuses solely on Hamilton's education at NorthAire, and ignores the evidence Hamilton presents regarding his classroom training at Yavapai. Hamilton avows that Yavapai forced him to turn in his employee identification card at the time of his termination, and told him to stay away from the college's campus. (Doc. 497 at 119.) Accordingly, Hamilton arguably lost his ability to attend classes on Yavapai's campus. (*Id.*) Hamilton also asserts that Yavapai improperly changed his grade from an "incomplete" to a "passing" grade. (*Id.*) Hamilton asserts this was improper because he never took his certification check ride, and thus he cannot obtain his certification. (*Id.* at 120.) Furthermore, the VA will not pay for Hamilton to retake these classes as long as his record reflects that he passed the courses. (*Id.*) This, according to Hamilton's declaration, leaves Hamilton in professional limbo. Yavapai does not present any evidence to controvert these claims, beyond asserting that Hamilton could have obtained a student identification card following his termination. Therefore, summary judgment is denied.

### 2. Claims Against Guidance and Stonecipher

Hamilton also asserts that Guidance and Stonecipher intentionally interfered with his employment contract with Yavapai by pressuring Yavapai to fire him. (Doc. 82 at 63–64.) Guidance moved for summary judgment on this claim, arguing that there is no

genuine dispute of the material facts, and that it is entitled to summary judgment because Hamilton cannot demonstrate that any of the actions taken by Guidance were improper. (Doc. 477 at 33–34.)

As an initial matter, Guidance did not address Hamilton's testimony that Stonecipher directly threatened Mr. Hamilton's job in a private meeting. (Doc. 497 at 116.) Hamilton avowed that after Hamilton opposed any actions that risked violating Regulation 4201, Stonecipher informed him that he was jeopardizing Guidance's program. (*Id.*) At that point, Stonecipher also told him to "keep in mind your job is reliant on [the helicopter program], we will take this up the food chain." (*Id.*) The very next day, Guidance's attorney, Alex Vakula, sent a letter to Yavapai. (*Id.*)

There are seven factors to weigh when considering whether an actions constitute interference;

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 387, 710 P.2d 1025, 1042 (1985) (*superseded by statute on other grounds*). Guidance asserts that the letter was sent without improper motive, as it was sent in response to a question Yavapai had regarding the safety program at Guidance. However, as Hamilton points out, the letter explicitly states that Guidance's counsel would "provide a more comprehensive response shortly," (Doc. 497 at 117), possibly indicating that the intent of the letter was not to provide a response to Yavapai's questions. Additionally, the timing and the content of the letter raise issues of fact, as the letter explicitly stated the tensions between Guidance and Yavapai were the result of an "unqualified and reckless employee." (Doc. 497 at 116.) In short, the facts of the record lend support to both arguments, and thus summary judgment on this count is properly denied.

In the alternative, Guidance asserts that Hamilton can make no argument against

Defendant Stonecipher because there is no evidence to suggest that Stonecipher acted outside of his role as a CEO of Guidance. Guidance was founded as a limited liability company ("LLC") under Arizona law, and thus Arizona law governs the extent of the liability Stonecipher could face as a member of the LLC. Generally, "[a] member of a limited liability company, solely by reason of being a member, is not a proper party to proceedings by or against a limited liability company." Ariz. Rev. Stat. Ann. § 29-656. However, where there is evidence that the member "participated in or acquiesced in or [was] 'guilty of negligence in the management and supervision of the corporate affairs causing or contributing to the injury,'" he may face personal liability for his participation in the injury. *Arizona Tile, L.L.C. v. Berger*, 223 Ariz. 491, 496, 224 P.3d 988, 993 (Ct. App. 2010), *as amended* (Feb. 8, 2010) (quoting *Jabczenski v. S. Pac. Mem'l Hosps.*, 119 Ariz. 15, 20, 579 P.2d 53, 58 (Ct. App. 1978)); *see Jabczenski*, 119 Ariz. at 20 ("A director who actually votes for the commission of a tort is personally liable, even though the wrongful act is performed in the name of the corporation."). Hamilton submits evidence suggesting that a jury could indeed find that Stonecipher was personally involved in the torts as alleged, as Hamilton avows that Stonecipher personally threatened his employment at one point. (Doc. 497 at 115–116.) Thus, the state law claims against Stonecipher will not be dismissed.

## C. Liberty Interest

A public employer may violate an employee's constitutional rights while terminating him if "the employer makes a charge 'that might seriously damage [the terminated employee's] standing and associations in his community' or 'impose[s] on [a terminated employee] a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities.'" *Tibbetts v. Kulongoski*, 567 F.3d 529, 536 (9th Cir. 2009) (quoting *Board of Regents v. Roth*, 408 U.S. 564, 573 (1972)).

However, to successfully recover, the plaintiff must also establish that the reasons behind his termination were publically disclosed, as "[u]npublicized accusations do not infringe constitutional liberty interests." *Bollow v. Fed. Reserve Bank of San Francisco,*

650 F.2d 1093, 1101 (9th Cir. 1981). Hamilton's claim hinges on an email sent from Ms. Eckel to Ms. Swafford. It is undisputed that Ms. Eckel emailed Ms. Swafford after previously contacting her out of concern that Guidance may have been inflating the flight hours it was providing to students. (Doc. 497 at 18; Doc. 449 at 24.) The email clarified that Yavapai's Director of Aviation brought an alleged discrepancy in flight times to the attention of Yavapai, and that Ms. Eckel subsequently determined that there was no discrepancy, and that Ms. Eckel believed that the discrepancies had been "purposefully fabricated" by the Director of Aviation. Ms. Eckel went on to report that Yavapai had "since terminated [its] director of aviation." (Doc. 497 at 118.) A subsequent email identified Mr. Hamilton as the former director of aviation at Yavapai. (*Id.*)

The Defendants assert that this email is insufficient to establish public disclosure, given that Ms. Swafford testified that she could not recall the email at issue, and that she generally deleted emails that were not relevant to her job. (Doc. 449 at 24.) In support of this, the Defendants cite to cases holding that Hamilton's claim cannot go forward absent public disclosure. However, the cases cited by the Defendants are distinguishable from the case at hand, as none of them involved a situation where an employer contacted an outside source and disclosed the rationale behind a plaintiff's termination. To the contrary, the cases cited by the Defendants stand for the proposition that information shared internally through a personnel file or a private discussion with the plaintiff does not amount to a public disclosure. *See Llamas v. Butte Cmty. Coll. Dist.*, 238 F.3d 1123, 1130 (9th Cir. 2001), *as amended* (Mar. 14, 2001) (keeping information regarding a plaintiff's termination in an internal personnel file did not qualify as public disclosure); *Bishop v. Wood*, 426 U.S. 341, 348–49 (1976) (finding no public disclosure where the information was disclosed to the plaintiff in a private meeting with his employer). Yavapai did not note fabricated flight hours as a justification for terminating Hamilton in his personnel file or to Hamilton in the course of a private meeting. Its agent went a step farther by affirmatively telling outside sources that Hamilton fabricated flight hour discrepancies. This disclosure to an outside source is sufficient to demonstrate that a

reasonable jury could find that the Defendants publically disclosed this information, thus summary judgment is denied.

The Defendants also argue that they are entitled to summary judgment because "stigmatizing statements do not deprive a worker of liberty unless they effectively bar her from *all* employment in her field." *Blantz v. California Dep't of Corr. & Rehab., Div. of Corr. Health Care Servs.*, 727 F.3d 917, 925 (9th Cir. 2013) (emphasis original). Inability to obtain employment with a specific employer, even a government employer, is insufficient to state a claim for deprivation of liberty interest without due process. *See id.* ("[P]eople do not have liberty interests in a specific employer," or in a civil service career generally." (quoting *Llamas,* 238 F.3d at 1128 (internal citations omitted)). However, Hamilton does not just assert that he is foreclosed from seeking employment with the government. In his declaration, Hamilton avows that he has been barred from obtaining employment in "flight related work" since his termination from Yavapai. (Doc. 497 at 121.) The Defendants counter by presenting evidence that Hamilton has obtained employment in the general field of aviation as a salesperson and a consultant, but this does not address Hamilton's assertion that he has been barred from obtaining employment in his chosen field of flight related work. (Doc. 449 at 26.) Therefore, summary judgment is denied.

### D. Guidance's Counterclaims

In response to Hamilton's claims, Guidance brought defamation and intentional interference with contract relations counterclaims. Hamilton moved for summary judgment as to both of these claims.

An individual is liable for publishing a "false and defamatory statement" regarding a private person "if, but only if, he (a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 236 Ariz. 568, 579, 343 P.3d 438, 449 (Ct. App. 2015), *review denied* (July 30, 2015) (internal quotation and citation omitted). "Substantial truth of an allegedly defamatory statement may

provide an absolute defense to an action for defamation." *Id.* Generally, court documents that are published in connection with a judicial proceeding are considered privileged, and cannot form the basis of a defamation claim. *Green Acres Tr. v. London*, 141 Ariz. 609, 615, 688 P.2d 617, 623 (1984). However, absolute privilege does not always insulate an attorney or his client from liability where a party shares the contents of court documents and other communications in a "press conference" setting. *Id.*

Much like the rest of this case, the factual foundations for the defamation claim are hotly contested by the parties. Hamilton asserts that an absolute privilege protects the communications he had with the Los Angeles Times, as his attorney shared excerpts of a court document pending in this case, specifically the Third Amended Complaint, (Doc. 82). As in *Green Acres Trust*, this reporter "played no role in the actual litigation other than that of a concerned observer," and thus he lacked the requisite connection to the judicial proceeding necessary for the absolute privilege to apply. *Green Acre Tr.*, 141 Ariz. at 615, 688. Hamilton does not articulate any reasoning as to why a qualified privilege may apply to the disclosure. Additionally, Guidance submitted various recordings of Hamilton's communications with NorthAire officials, including Justin Scott and David Yeley, in which Hamilton accuses Guidance of committing fraud and targeting Hamilton for identifying the fraud to Yavapai.[8] (Doc. 494 at 30–32.) Hamilton does not appear to dispute that he made these statements, but their falsity remains contested. At this juncture the underlying facts are still contested by the parties, and thus summary judgment on the defamation claim is denied.

Hamilton's sole argument to dismiss the intentional interference with contractual relations claim relied on the dismissal of the defamation claim, as he asserted that this claim is dependent upon the defamation claim. Because the defamation claim survives,

---

[8] In his Reply, Hamilton alludes to a statute of limitations defense against the recordings cited by Guidance. (Doc. 515 at 11 n.11.) However, because this argument was raised for the first time in his reply, the Court will not consider it. *See generally United States v. Bohn*, 956 F.2d 208, 209 (9th Cir. 1992) (noting that courts "ordinarily decline to consider arguments raised for the first time in a reply brief.").

the intentional interference with contractual relations claim survives as well. Summary judgment is denied.

## CONCLUSION

For the foregoing reasons, Hamilton's Motion for Partial Summary Judgment, (Doc. 457), is denied. Guidance Defendant's Motion for Summary Judgment (Doc. 477) is granted in part and denied in part. Yavapai's Motion for Summary Judgment, (Doc. 476), and Cross Motion for Partial Summary Judgment, (Doc. 489), are granted in part and denied in part.

**IT IS THEREFORE ORDERED** that Hamilton's Motion for Partial Summary Judgment (Doc. 457) is denied.

**IT IS FURTHER ORDERED** that Guidance Defendants' Motion for Summary Judgment (Doc. 477) is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Yavapai Defendants' Motions (Doc. 476, 489) are granted in part and denied in part as follows:

Any claims that the Defendants violated the false claims act by counting all the students enrolled in the combined AVT program are dismissed.

Count Nine is dismissed as to Defendant Yavapai and Morgan's alleged interference with Hamilton's employment opportunity at NorthAire Aviation. However, the claim that Defendants' Morgan and Yavapai interfered with Hamilton's education survives summary judgment.

Summary Judgment is denied as to all other claims and counterclaims.

Dated this 13th day of April, 2018.

_S. Murray Snow_
Honorable G. Murray Snow
United States District Judge